**Dolores J. COPELAND, Plaintiff,**

v.

**SECRETARY OF LABOR, Defendant.**

**Civ. A. No. 74–1822.**

United States District Court, District of Columbia.

March 31, 1976.

Mary McReynolds, John H. Harwood, II, Washington, D. C., for plaintiff Copeland.

Paul M. Tschirhart, Asst. U. S. Atty., Washington, D. C., for defendant Secretary of Labor.

## MEMORANDUM RE PLAINTIFF COPELAND

GESELL, District Judge.

This is a class action alleging sex discrimination. A class of approximately 24 females employed in various branches of the Department of Labor's Directorate of Data Automation (DDA) has been certified. Plaintiff is the representative of the class.

On the eve of trial following extensive discovery and rulings on numerous pretrial motions, a stipulation was presented and approved which resolved the merits of the sex discrimination claim against the Secretary. This stipulation reads in pertinent part as follows:

1. . . . [T]he Office of the Assistant Secretary for Administration, Directorate of Data Automation of the Department of Labor, and its predecessor organizations have subjected her [referring to plaintiff Copeland] and the other members of the class to sex-based discrimination in *assignments, training, performance evaluations, promotions,* and *working conditions,* all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e–16.

. . . . .

3. . . . In order to expedite the resolution of this litigation, Defendant does not contest the allegations of a pat-

tern and practice of sex discrimination contained in Plaintiff's complaint, as described in Paragraph No. 1 of this Stipulation. (Emphasis added.)

In addition to requiring the development of an affirmative action plan for all female employees in positions requiring knowledge of data processing, the stipulation further provided in paragraphs 5 and 6:

5. The injury or monetary impact, if any, suffered by Plaintiff or any other participating member of the class certified in this action on July 2, 1975, shall be determined after evidentiary hearing to be scheduled as promptly as practicable. Defendant acknowledges that after Plaintiff or other participating member of the class has presented a claim before the Court, Defendant carries the burden of affirmatively showing that sex discrimination has not monetarily or otherwise affected the individual class member involved.

6. Plaintiff and Defendant agree to be bound and abide by the determinations made after the evidentiary hearing on Plaintiff Copeland's claim for retroactive promotion and back pay and there shall be no appeal taken therefrom.

Pursuant to the stipulation, an evidentiary hearing was promptly held as to Ms. Copeland's individual claim. Numerous witnesses were heard and extensive documentary evidence submitted. The matter has now been briefed. This Memorandum resolves that claim.

Ms. Copeland seeks a retroactive promotion from GS–13 to GS–14 effective as of April 1, 1972, with full back pay, and assurance that she hereafter will be given assignments consistent with a GS–14 grade, together with whatever training may be appropriate for such duties. The Secretary disputes her showing of competence and professional abilities by asserting that she "is the victim of her own personality and inability to perform within the Department of Labor, not of sex discrimination." Thus the issue is drawn whether the Secretary has met his admittedly heavy burden of establishing that in spite of the conceded pattern of sex discrimination continuously affecting Ms. Copeland's work she would not have received a GS–14 with duties and responsibilities commensurate with that grade.

Ms. Copeland is a black, age 55, who graduated from Hampton Institute in 1942 with a BS degree. After working for the War Department and the Bureau of Engraving, where her performance received excellent appraisals, she began her employment in July, 1967, with the Department of Labor, Washington, D. C., in data processing. She started as a GS–12 systems analyst and was later promoted to GS–13 in May, 1970. Plaintiff has long believed that her career in the Department has been thwarted by discriminatory acts based on her race or sex. On a number of occasions she voiced complaints claiming denial of opportunity and when nothing tangible resulted she eventually filed a formal complaint alleging race and sex discrimination in June, 1973. This class suit followed when her complaint was rejected by the Office of the Assistant Secretary for Administration and Management of the Department of Labor on November 8, 1974.[1] That determination read in pertinent part as follows:

. . . Your allegation of sex discrimination is supported by the file and I, therefore, am disposed to find that a pattern of sex discrimination exists in the Departmental Data Processing Center (DDPC). This discrimination manifests itself in the lack of leadership responsibility assignments given to qualified women professionals, including yourself. However, the file does not indicate that your non-promotion to the GS–14 level was the result of this sex discrimination.

1. The complaint contains the usual class allegations. Because the class was not precisely defined and because the class members had available alternative administrative remedies they might choose to pursue, the Court ordered an "opt in" procedure and the action has been confined to claims by those women who have affirmatively indicated a desire to proceed as members of the class.

The file further reveals a serious employee-supervisor problem which has not been properly addressed by management. Thus I find that your various other allegations, including denial of training, improper performance evaluations, nonreceipt of basic office supplies, poor seating arrangements, intimidation, threats, defamation, and consistent harassment are attributable to the conflict between you and your supervisors, but are not the result of sex discrimination.

Advancement to GS–14 is not, of course, automatic. It is achieved in two ways: *competitively* when a GS–14 vacancy is advertised and, under Civil Service regulations, individuals deemed qualified are certified by a panel and choice is made from among those certified; *noncompetitively* by material modification when an individual gradually assumes added responsibilities growing out of assigned duties and in effect alters the status of the original job. While each process is more complex than this summary suggests, it is apparent that one reaches GS–14, a high grade, only after gaining special qualifications which meet the needs of specific jobs. In general, the GS–14 grade in the unit where Ms. Copeland worked demanded among other qualities the ability to manage or direct the work of others as well as professional competence in the computer field.

The environment of the Directorate where plaintiff Copeland has worked was frenetic. In less than a year and a half—from December 1968 to April 1970—the data processing unit grew from an organization having one division and two branches with rather minor responsibility for providing data processing support to other units in the Department of Labor into an organization having three divisions and a total of eight branches with theoretical responsibility for the full spectrum of data processing services. During the next several months, efforts were largely directed toward becoming truly operational. The unit acquired a new third-generation IBM 360–65 computer and continued to hire a large number of employees. The change in the organization is well demonstrated by numbers: in December of 1968, the Directorate had 37 government employees (16 professionals); by December of 1970, the Directorate had more than 100 government employees (more than 60 professionals). In addition, to meet the demand for its services, the unit engaged the services of a number of private computer firms which assigned numerous additional employees on site to assist. Growth continued over the next three years and was accompanied by several internal reorganizations. By the end of 1972 there were 175 employees, which included 100 professionals. By this time almost all computer activities were centralized in this department. During this growth various audits and studies focusing on performance and efficiency occurred with emphasis on management objectives.

Inevitably there were increasing pressures for decentralization. Various offices which had been serviced by the Directorate sought to take over or enlarge responsibility for their own systems using their own staffs. At least by April, 1974, the focus was pointedly on decentralization. Studies revealed serious management and personnel deficiencies and the Directorate was thereafter split up and many of the functions assigned back to various offices. A study of the unit completed May, 1975, found and described many questionable management practices under the following headings: (1) "Protecting Individuals in their Jobs," (2) "Misuse of Management Resources," (3) "Non-uniform Shift Schedule," (4) "Use/Misuse of Contractors," (5) "Efforts to Improve Quality of Service," (6) "Submissive Attitude Toward User Agencies," (7) "Extensive Overtime," and (8) "Low Morale." Under the last heading the study found that

> the concept of employees that seems to prevail among DDA managers is that they are only extensions of machines, whose basic needs and aspirations are not important.

As a general observation the study noted:

> Management practices in DDA have been observed by the study team to be

generally poor. Such practices range from not assigning responsibilities to competent professionals, to basically assuming that employees are inherently lazy and will seek to avoid work at every opportunity.

This sketchy review of organizational changes and administrative problems is particularized in a stipulated account, with charts and other detail, which will be found in Plaintiff's Background Factual Memorandum, pages 1–30.

Throughout this period when managers were vying for status and recognition, the responsible positions were all held consistently by men occupying the grade of GS–14 or higher. No women achieved the GS–14 level. Between 1969 and the present, there have been 16 promotions to the GS–14 level in data processing professional positions in the DDA and in its predecessor and successor organizations. All have been promotions of male professionals. No women in the Directorate have ever been promoted above the GS–13 level, and Ms. Copeland was the highest grade female employee in the Directorate. (Stipulation of March 12, 1976).

The record does not indicate that any positive program existed for personnel training and advancement to grade GS–14. Assignments were made in a hit-or-miss fashion to fill urgent needs as they arose. There was a marked absence of counselling, at least in Ms. Copeland's case. The heavy demands on DDA, the state of almost constant reorganization and considerable turnover, and the shortages of personnel and often arbitrary deadlines, led to considerable improvisation as to assignments. Managers were brought in mostly from outside and were unaccustomed to Civil Service procedures.

Given these conditions, it is literally impossible for a trier of fact to go back over a ten-year period and determine exactly when or how the pervasive pattern of sex discrimination which has been conceded did or did not affect Ms. Copeland's progress to GS–14 at each stage of her career. This is made doubly difficult because she is black.

It is clear that the general disarray of the unit caused by the circumstances already outlined played some part. Even absent sex discrimination some injustices would inevitably have occurred, but the continuing inferior status of women in the organization is apparent.

Most of the record focused on Ms. Copeland's work performance and personality. The sum total of the proof presents irreconcilable contradictions. Throughout her service at the Directorate Ms. Copeland has acted with dignity and assurance. She was conscientious and willing to work and did not engage in intrigue. But at the same time she was persistently stubborn. Various comments on her work during her career at the Directorate are listed below and reflect her somewhat unique personality:

basically competent
deserving
greatly exceeds expectations
highly professional
independent
precise
quiet
refined
superior
very thorough
degrades subordinates—inept
doesn't communicate well with staff
erratic
failed to win client confidence
incompatible
overly sensitive
too conscious of status

On occasion her work brought genuine appreciation and commendation from customers and supervisors, and on other occasions she was pointedly criticized for failure to meet deadlines or carry work through to acceptable conclusion. She resented unfavorable criticism and at least in some instances the criticism was undeserved, if not malicious. Even the views of her superiors as to her performance vacillated.

Whatever the reasons, plaintiff gradually became a growing personnel problem. The feeling she would be difficult to work with

grew in the Directorate so that assignments could not be easily made. This resulted in her being given work below her qualifications and stimulated her resentment. Some of her failures were caused by an unwillingness to do work that was below her grade. At times she was subjected to biased, unfair evaluations and became the subject of gossip memos which even suggested, without any support whatever, that she was mentally ill. Complaints from customers of DDA were often used to downgrade her performance undeservedly because many of the difficulties were caused by inadequate support, confusing assignments or unrealistic time schedules for completing performance. Throughout this period she confronted male bosses and male evaluators and functioned in an atmosphere of sex discrimination affecting all aspects of personnel management.

The Secretary has sought to show that Ms. Copeland was not qualified to be considered for the two GS–14 vacancies advertised under Civil Service rules in 1972, the point when Ms. Copeland asserts she should have been promoted to that grade. These appointments were conducted in an atmosphere which prevented impartial choice. In each instance a male was pre-selected for the vacancy and given special experience prior to selection, and the standards were written by another male to give the pre-selectee the inside track. The extent this maneuvering had an underlying sex bias is far from clear. Civil Service procedures were followed in form, but they were meaningless as a practical matter. The GS–14 positions went to individuals who in contrast to Ms. Copeland had had practical supervisory experience.

In dealing with her back pay claim, complex problems of proof necessarily arise. Here is a female employee who admittedly functioned in an atmosphere of sex discrimination which existed over a substantial period. The Secretary has presented persuasive evidence that Ms. Copeland in spite of her admitted competence in many areas had difficulty in her day-to-day dealings with some supervisors and assistants. Some of these tensions undoubtedly arose from resistance to her sex; others reflected her manner and personality and perhaps her race.

The situation is further complicated because in fact there was no way a woman such as Ms. Copeland could have obtained training in the supervisory skills these positions required. Since training and assignment are each among the aspects of the activity infected by the pattern of sex discrimination, it becomes a close question whether Ms. Copeland's lack of advancement to grade GS–14 at this stage can be attributed in part to sex discrimination. That there were some obstacles to her advancement caused solely by her traits or factors other than lack of training is apparent but it is impossible at this stage to determine whether the views of those with whom she came in contact in her work reflect sex bias or to isolate the degree to which it can be said her deficiencies standing alone would have retarded her progress at this point.

A degree of sex discrimination always played a part in plaintiff's career. However, the record shows that in spite of this she begrudgingly was advanced to grade GS–13 in May, 1970. The Court has concluded that in a normal course of affairs, absent any sex discrimination, she would not have achieved GS–14 in this agency by the 1972 vacancy selections, less than two years after her previous promotion. In particular, the greater practical supervisory experience of the men actually chosen was clearly a major factor in the selections. Sex discrimination played no apparent part in her failure to be selected at this precise time.

A competitive GS–14 vacancy was again announced in April, 1973, but Ms. Copeland was not certified as eligible because she was not rated as highly qualified. Eligibles were sought off the Civil Service register from outside the agency, except in one instance. By this time it is apparent that Ms. Copeland had been the victim of increasingly unfair and irregular evaluations of her work in part due to her sex, was not being

assigned work commensurate with her skills, and was being intentionally denied an opportunity for further advancement.[2] By April, 1973, the Directorate itself was in a chaotic situation and for many reasons management had totally failed to perform. EEO complaints and countercharges had undermined morale and led many males and females, blacks and whites, to gossip, misrepresent and become defensive to a point where objectivity in promotion and assignment was totally lacking. The sexist attitude of the male supervisors was pervasive.

There is a clear indication that because of EEO pressures Irving Baggett, Ms. Copeland's superior and supervisor, would have chosen her for GS–14 at this time if she had been certified as eligible. She failed certification because of unfair and incomplete evaluations that, in substantial part, reflected the sex bias extant in the Directorate.

This course of events forces the conclusion that Ms. Copeland's failure to be promoted to GS–14 at this point was caused by sex discrimination and by certain deficiencies in her personality as it affected her ability to work smoothly with several key employees under the conditions then existing in the Directorate. The preponderance of the evidence fails to establish that only the second factor was responsible. Indeed, by April, 1973, sex discrimination was blatantly present in the area where Ms. Copeland worked, and there have been 11 promotions to GS–14 from May, 1971, when Ms. Copeland became eligible for promotion to that grade but no female so advanced. The substantial impact of sex discrimination on plaintiff's assignments, evaluations and promotion is affirmatively established.

The Secretary has been unable to establish that sex discrimination did not play a part in the failure of Ms. Copeland to advance at this time. The burden the Secretary correctly assumed under the stipulation, a burden which the law itself imposes, *Day v. Mathews,* 530 F.2d 1083 (D.C.Cir. 1976), is, as a practical matter, almost insurmountable in this instance. It is impossible to create a model of how the Directorate would have been structured and operated in the absence of widespread sex discrimination as previously noted.

Apart from these inherent difficulties of the problem viewed in the abstract, it should be noted that some important records have been destroyed. Plaintiff's discovery into certain critical areas was seriously hampered by failure of key personnel to disclose crucial documentation until the last minute. Some evaluations were back dated and some are clearly false. Several key officials were not called to testify to explain their conduct. The Court was unable to accept the contradictory testimony of the Secretary's chief witness, Irving Baggett, as wholly credible. Cause and effect cannot be wholly separated. The "but for" defense requires a higher degree of proof than the Secretary's able and effective counsel could marshal, viewing the weight of the evidence as a whole.

In fashioning relief the Court must exercise its wide discretion in a manner that attempts realistically to make Ms. Copeland whole for the sex discrimination she has suffered. *Albemarle Paper Company v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Franks v. Bowman Transportation Co., Inc.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444, (1976). Accordingly, back pay at grade GS–14 retroactive to June 1, 1973, will be awarded and Ms. Copeland is to receive that rating with all normal in-grade promotions that would have occurred thereafter.

Apart from back pay, Ms. Copeland desires work that is commensurate with GS–14 and training to assist her to meet such duties responsibly. There is a limit to the remedial arm of the Court. A judge cannot

---

**2.** Her true ability was indicated at this time from an outside source. Although the effort to deprecate her performance persisted, the agency received an unsolicited letter of appreciation on November 9, 1973, from the Occupational Safety and Health Administration for her valued advice and expertise in developing a high priority computer program to which she was assigned.

completely remove the impact of past injustices nor prevent the obvious tensions that will continue to beset plaintiff on the job, given some of the quirks in her personality that have been noted. The affirmative action plan being evolved will hopefully aid. Certainly, at the very least, assignments at the GS–14 level and training for supervisory and management duties should be provided to plaintiff. Beyond this there is little that can be done to assure a fresh start with any certainty. Pioneers in major social movements, and in many ways Ms. Copeland is one, always carry scars. It will be for those in the Department above her immediate supervisors with whom she has been in conflict to fashion a solution and the Court can only direct in general terms what the law and equities of the situation require. A new start in a different environment within the Department of Labor would be entirely appropriate. The Government in its brief has acknowledged:

> As a women [sic] in the Directorate, Mrs. Copeland has suffered at least some ill effects of sex discrimination. By bringing the problem to light, she has moved the Department toward a potential remedy for the situation, and for this she is to be commended.

The Court expresses the hope that the Secretary will make Ms. Copeland's further progress a matter of his personal concern.

Further proceedings are required to establish and effect an affirmative action plan, to resolve the remaining claims of other class members by reference to a master, if necessary, and thereafter to award counsel fees. Counsel shall attend a status conference at 2:00 p. m. on April 9, 1976, to set the future schedule. At that time counsel for plaintiff Copeland shall submit an order and judgment covering the determinations made in this Memorandum.