Dolores J. COPELAND, Individually and on behalf of the class of all others similarly situated

v.

F. Ray MARSHALL, Secretary of Labor, Appellant.

No. 77–1351.

United States Court of Appeals, District of Columbia Circuit.

Argued 1 May 1978.

Decided 30 Oct. 1978.

Rehearing Denied June 29, 1979.

Neil I. Levy, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry and William D. Pease, Asst. U. S. Attys., Washington, D. C., were on brief, for appellant.

John H. Harwood, II, Washington, D. C., with whom Gary D. Wilson and Mary A. McReynolds, Washington, D. C., were on brief, for appellee.

Morton Hollander, Atty., Dept. of Justice, Washington, D. C., for appellant.

Before TAMM and WILKEY, Circuit Judges, and DAVIES,* Senior United States District Judge for the District of North Dakota.

WILKEY, Circuit Judge:

The appeal of the Government in this case presents the complex issue of the standards and procedures to be followed in awarding attorneys' fees to a party prevailing in litigation against an agency or department of the United States under the employment discrimination provisions of Title VII of the Civil Rights Act of 1964 (Title VII).[1] While the District Court grappled with the problem on the basis of guidelines previously set forth, a satisfactory solution eluded it; hence, we necessarily remand this case. In so doing, we set forth additional and more specific standards which conceivably may assist the trial court in reaching fair and uniformly grounded awards in this and future cases.

---

\* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. Pub.L. No. 88–352, Title VII, 78 Stat. 253 (enacted 2 July 1964), 42 U.S.C. § 2000e to 2000e–17 (1970 & Supp. V 1975), as amended by the Equal Employment Opportunity Act of 1972, Pub.L. No. 92–261, § 11, 86 Stat. 111 (enacted 24 March 1972), 42 U.S.C. § 2000e–16(d) (Supp. V 1975).

2. *Copeland, et al. v. Usery,* No. 74–1822 (D.D.C. 6 Jan. 1977).

3. *Copeland v. Sec'y of Labor,* 414 F.Supp. 647 (D.D.C.1976).

4. *See* Appendix vol. I at 26.
   In June 1973, eighteen months prior to the filing of her complaint in the District Court, appellee filed with the Department of Labor a formal administrative complaint of sex discrimination. The Department in a ruling on her case on 7 November 1974 acknowledged the existence of a "pattern of sex discrimination" in work assignments in the Data Processing Center in which appellee was employed, but denied that appellee's non-promotion was the result of this sex discrimination. App. vol. I at

## I. BACKGROUND OF THE LITIGATION

The present appeal arises from a disposition by the District Court on 6 January 1977[2] of an application for an award of attorney's fees and costs based on the District Court's earlier favorable ruling on the merits[3] of a complaint filed on 13 December 1974. The appellee-plaintiff is a female employed by the United States Department of Labor (Department) in its Data Processing Center. For herself and a class of female employees similarly situated, appellee sought relief from the Secretary of Labor and seven Department officials on a charge of sex discrimination in work assignments, training, promotion, and other conditions of employment, in violation of Title VII and various Executive Orders.[4]

Nothing was spared in the development of the case. After several pretrial motions, the parties began a period of exhaustive discovery. Detailed interrogatories were served by the Department on each of the appellee's 24 participating class members,[5] and appellee served on the Department extensive requests for documents that the Department alleges required "several computer programs" and "as many as twenty-five people at one time" to process.[6] After the

---

47. Appellee subsequently filed this suit in the District Court seeking further relief.

5. Brief for Appellees at 8.

6. Brief for Appellant at 5. Various charges have been exchanged between the parties concerning the utility of this extensive discovery process and the degree of cooperation of parties with it. The Department alleges that appellees' counsel entered requests for unnecessarily "massive" amounts of material and triggered a discovery ordeal that was "virtually unprecedented in the history of Title VII litigation." *Id.* at 21–22. Appellees, on the other hand, allege that the Department failed to cooperate fully with appellees' discovery requests, Brief for Appellees at 7, and that the Department concealed and even destroyed documents relevant to appellees' claim, *id.* at 10. Appellees' charges of non-cooperation by the Department in the discovery process were supported in part by the trial court. *Copeland v. Sec'y. of Labor, supra,* 414 F.Supp. at 652 (important records "destroyed" and discovery "seriously hampered by failure of key [Department] personnel to disclose crucial documentation until the last minute.").

discovery process was nearly complete, and only one week before trial, the Department entered into a stipulation conceding that it had subjected appellee and other class members to "sex-based discrimination" in violation of Title VII [7] and agreed to implement an affirmative action program for female employees of the Data Processing Center.[8] The Department further stipulated that appellee was the prevailing party for purposes of entitlement to attorneys' fees and costs.[9]

There followed a six-day trial without jury on the question of appellee's individual claim for relief. The court found the record far from clear on the role of discriminatory practices in the advancement of appellee's career, but nevertheless ruled in her favor and ordered that she be promoted to a higher GS level and be granted back pay [10] amounting to $4,169.80.[11]

To meet the equitable claims of the class, the Department then filed an affirmative action plan. Appellees considered this plan to be unsatisfactory and introduced a comprehensive plan of their own, much of which·was later adopted by the Department and by the court.[12] Following further discovery and negotiations, a settlement was reached concerning claims of the remaining members of the class, which resulted in promotions for a number of employees, further training for four employees, and back pay awards totaling $27,175.71.[13]

In sum, proceedings up to the initiation of the present appeal continued at an active pace for 17 months and brought about the filing of more than 2,000 pages of briefs, some 27 hearings and conferences in chambers, and one week-long trial.[14] No one can fault the litigants for lack of enthusiasm. Their zest for legal combat was apparent, and their plaintiff clients undoubtedly benefited thereby. However, it is precisely this combination of youthful enthusiasm for and inexperience in litigation which frequently raises the difficulties in fixing fees in this type of case.

On 30 November 1976 appellees filed the motion for an award of costs, including attorneys' fees, which is the subject of the present appeal. Appellees sought reimbursement for the services for four attorneys involved in their case at the "normal billing rates" charged by the attorneys' Washington, D.C., law firm.[15] At an hourly rate that ranged from $51.65 for the services of a young associate to $89.92 for the services of a partner,[16] appellees sought reimbursement in full for 3,602 hours of attorney time at the substantial total cost of $205,916.50.[17] In support of their motion for an award of this large sum, appellees submitted affidavits provided by each counsel stating his or her educational background and legal experience, and itemizing the number of hours spent by each attorney

7. App. vol. I at 64.

8. *Id.* at 65.

9. *Id.* at 66.

10. *Copeland v. Sec'y of Labor, supra,* 414 F.Supp. at 652–53.

11. Brief for Appellees at 17.

12. *Id.* at 19–20; App. vol. I at 83–84.

13. Brief for Appellants at 8; Brief for Appellees at 22.

14. Brief for Appellees at 29.

15. Brief for Appellees at 22; App. vol. II at 95.

16. App. vol. II at 95. A second associate on the case sought an hourly fee of $54.32, and the second partner sought $72.46. The average

hourly fee charged by the four attorneys, weighted according to the number of hours logged by each, was $57.17. *Id.*

17. *Id.*

Appellees also sought to recover $12,602.59 in costs, which included the cost of transcripts and photocopying and a variety of miscellaneous smaller disbursements. *Id.* at 101. The trial court awarded $11,567.77 for costs, thus barring compensation for a number of minor items. Although objection to this award of costs was made in appellant's Notice of Appeal filed on 2 March 1977, App. vol. 2 at 229, the issue was not briefed by either party or discussed at oral argument. Therefore, the trial court's award of costs, excluding attorneys' fees, is not a matter of dispute on this appeal.

on the case in monthly periods.[18] This record reveals that 80% of the total number of hours charged to appellees' case was logged by junior associates with little or no courtroom experience or special knowledge in the area of Title VII.[19] Furthermore, no itemization was provided of the number of hours spent by each attorney on particular tasks within monthly periods. Thus the same billing rates were charged for a wide range of activities which included appearances at trial, review of files, and attendance at conferences among co-counsel.[20]

Appellees also submitted a report of a survey conducted by an outside source [21] of hourly rates, applicable to work on employment discrimination cases, charged by attorneys in four Washington, D.C., law firms, including the firm of appellees' attorneys. The report indicated that each firm surveyed charged an hourly rate of between $35 and $50 for the services of associates and between $50 and $100 for the services of partners.[22] This report is the only evidence in the record concerning fees customarily charged by appellees' firm,[23] and appellees made no attempt to explain the evident discrepancy between the fees cited in the survey and the higher fees requested by the two associates on this case.[24]

On the basis of this record and his personal familiarity with the proceedings in this case, the trial judge concluded that $160,000 in attorneys' fees should be awarded to appellees' counsel,[25] thus granting nearly four-fifths of the requested fees. In making this determination, the trial judge noted that the litigation was "hard fought," the representation afforded appellee was "excellent," and "[n]o time was deliberately wasted." [26] In contrast, however, the judge very discriminatingly observed that there was "practically no partner time expended on this case," the "associates lacked experienced trial direction," and "not all of the work proved productive." [27] The judge also mentioned, without itemization, the "results achieved, the novelty of the issues, the difficulties encountered," and "each of the [other] factors itemized in *Evans v. Sheraton Park Hotel*. . . ." [28]

The accuracy of the log presented by appellees' attorneys is not a subject of dispute on this appeal, nor is the right of appellees' attorneys to recover a reasonable fee. Instead, appellant has charged that the investment of the hours logged was

---

18. App. vol. II at 103–42.

19. One of the two associates sought $54.32 for each of 1,413 hours spent on this case, and the other sought $51.65 for each of 1,498 hours. The number of hours logged by the two attorneys together is 2,911, of a total computed for all four attorneys of 3,602. App. vol. II at 95.

   The associate who sought the higher fee had been a member of the Bar for two years prior to becoming involved with this action. During those two years she was involved primarily in study for a Masters of Law degree. App. vol. II at 119. The other associate had been a member of the Bar for less than one year, and for seven months of this time served as deputy director for the Institute for Public Interest Representation in Washington, D.C. *Id.* at 134–35. Both associates were assigned to this case within one month of their association with their Washington, D.C. law firm. *Id.* at 119–20, 135.

20. *See* App. vol. II at 105–42.

21. Roderic V. O. Boggs, Executive Director of the Washington Lawyers' Committee for Civil Rights Under Law. Letter dated 1 August 1975. App. vol. II at 143.

22. *Id.*

23. Appellees also submitted to the trial court a chart showing attorneys' fee applications and awards in "civil rights and similar cases" brought in recent years in this and other jurisdictions. *Id.* at 145–49. This chart indicates that although a wide range of rates has been sought by and awarded to attorneys in the past, no fees awarded ranged as high on an hourly basis as that sought by the highest-paid counsel to appellees here, *id.*, and in only one instance was an hourly fee even sought that topped this counsel's fee, *id.* at 147.

24. *See* text at note 16 & note 16 *supra*.

25. *Copeland, et al. v. Usery, supra*, slip op. at 3–4.

26. *Id.* at 2–4.

27. *Id.* at 3.

28. *Id. See Evans v. Sheraton Park Hotel*, 164 U.S.App.D.C. 86, 503 F.2d 177 (1974).

"excessive," and out of proportion to the results achieved and to the time spent achieving similar results in other cases.[29] Appellant also alleges that the evidentiary basis presented to the trial court in support of the motion for fees was inadequate, that the court did not review the record and the various relevant factors with sufficient particularity, and that in determining fees the court gave excessive weight to some factors and inadequate weight to others.[30]

We find sufficient merit in these allegations to warrant further consideration by the District Court of the attorneys' fees awarded in this case, under the standards applicable to the determination of such fees in successful Title VII litigation against an agency of the United States. We turn now to a consideration of those standards, the proof necessary, and the applicability of the standards to the facts of this case.

## II. APPLICABLE LAW AND STANDARDS FOR ATTORNEYS' FEES

### A.

█ The power of courts to award attorneys' fees to prevailing parties in Title VII litigation is conferred by statute,[31] which, by amendment in 1972,[32] was made applicable to suits brought under Title VII against the federal Government. The operative statute [33] reads:

> In any action or proceeding under . . . [Title VII] the court, in its discretion, may allow the prevailing party, other than the [Equal Employment Opportunity] Commission or the United States, a reasonable attorney's fee as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.

In passing the 1972 amendment Congress intended to facilitate the prosecution of equal employment opportunity claims against the Government by providing an opportunity for counsel to prevailing plaintiffs to recover fees. As this Circuit stated recently, the attorney fee provision of Title VII has the "broad purpose of abetting enforcement of that Title by encouraging individuals injured by racial discrimination to seek the relief made available thereunder . . . ." [34] This court has favored a "liberal construction" of the section [35] and

**29.** Brief for Appellant at 11.

**30.** *Id.* at 13.

**31.** Civil Rights Act of 1964, Pub.L. No. 88–352, Title VII, § 706(k), 78 Stat. 261 (enacted 2 July 1964), 42 U.S.C. § 2000e–5(k) (1970).

**32.** Equal Employment Opportunity Act of 1972, Pub.L. No. 92–261, § 11, 86 Stat. 111 (enacted 24 March 1972), 42 U.S.C. § 2000e–16(d) (Supp. V 1975).

**33.** 42 U.S.C. § 2000e–5(k) (1970).

**34.** *Parker v. Califano*, 182 U.S.App.D.C. 322, 332, 561 F.2d 320, 330 (1977). Such private enforcement action is essential because, as this court pointed out, suits by the Attorney General or Equal Employment Opportunity Commission are not authorized in behalf of federal employees against federal agencies, and frequently the Attorney General is counsel to the Government side. *Id.* at 331. With regard to Title II of the Civil Rights Act of 1964, 78 Stat. 244, 42 U.S.C. §§ 2000a to 2000a–6 (1970), which at 42 U.S.C. § 2000a–3(b) (1970) provides for the award of attorneys' fees by language nearly identical to that of Title VII, the Supreme Court has stressed the importance of attorney fee provisions. The Court stated:

> When the Civil Rights Act of 1964 was passed, it was evident that enforcement would prove difficult and that the Nation would have to rely in part upon private litigation as a means of securing broad compliance with the law. . . . If successful plaintiffs were routinely forced to bear their own attorneys' fees, few aggrieved parties would be in a position to advance the public interest by invoking the injunctive powers of the federal courts. Congress therefore enacted the provision for counsel fees . . . to encourage individuals injured by racial discrimination to seek judicial relief under Title II.

*Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 401–02, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263, 1265–66 (1968) (footnotes omitted). *See also Fairley v. Patterson*, 493 F.2d 598, 606 (5th Cir. 1974); *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 716 (5th Cir. 1974) (purpose of Title VII attorney fee provision to "effectuate the congressional policy against racial discrimination").

**35.** *Parker v. Califano, supra*, 182 U.S.App.D.C. at 333, 561 F.2d at 331, citing as support for such "liberal construction" this court's opinion in *Evans v. Sheraton Park Hotel, supra*. In *Parker v. Califano*, this court held that in a Title VII action where the federal employee is

joined other courts in upholding the award of attorneys' fees to prevailing plaintiffs in employment discrimination cases against a federal agency or official.[36] In *Evans v. Sheraton Park Hotel*,[37] an action under Title VII in which a private employer and labor union were the defendants, this court aligned itself with the guidelines set out earlier by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*,[38] for the award of attorneys' fees to a prevailing plaintiff.

It has not been an easy task, however, for courts to determine the standards that should be applied to the determination of "reasonable" fees within the meaning of the Act in cases in which a federal agency is the defendant. The present case is the first to come before this Circuit which raises directly the issue of whether the standards that are to be applied in awarding fees in a case in which a private party is the defendant are also to be applied in a case brought against a federal agency. The applicable statute provides that in awarding attorneys' fees "as part of the costs" in a Title VII case, the "United States shall be liable for costs the same as a private person."[39] All private persons are not equal in financial resources, however, and private persons do not have at their disposal financial resources comparable to those of the United States. The statute itself, therefore, does not fully settle the issue of the extent to which the resources of the United States are to be tapped in order to compensate

attorneys for their efforts on behalf of private party plaintiffs in Title VII litigation against the Government.

■ We hold that the considerations enumerated by this court in *Evans v. Sheraton-Park Hotel* for the determination of attorneys' fees in an action against a private party are applicable generally to Title VII cases against a federal agency, but that special caution must be shown by the trial court in scrutinizing the claims of attorneys for fees against a federal agency in such litigation. Special caution is required because of the incentive which the defendant's "deep pocket" offers to attorneys to inflate their billing charges and to claim far more as reimbursement than would be sought or could reasonably be recovered from most private parties.

■ As in *Evans*, the standard to be applied in cases such as this is not one of "compensation in full for all services rendered by attorneys, computed at those attorneys' maximum hourly rates,"[40] or even of some predetermined and arbitrary fraction of full compensation.[41] Rather, a trial court must carefully consider each of the factors enumerated in *Evans*, and utilize such procedures and make such calculations as are necessary in order to determine an award only of those attorneys' fees that could reasonably be charged against a *private party defendant* in sound financial standing. Further, though the calculus is

---

the prevailing party, attorneys' fees may be awarded to counsel for that party as compensation for legal services performed prior to filing of the judicial complaint. *Id.*, 182 U.S.App. D.C. at 335, 561 F.2d at 333.

**36.** See, e. g., *McMullen v. Warner*, 416 F.Supp. 1163 (D.D.C.1976); *Johnson v. United States*, 12 E.P.D. ¶ 11,039 (D.Md.1976), aff'd, 554 F.2d 632 (4th Cir. 1977); *Smith v. Kleindienst*, 8 F.E.P. 752 (D.D.C.), aff'd sub nom. *Smith v. Levi*, 174 U.S.App.D.C. 70, 527 F.2d 853 (1975) (decision without opinion); *Reynolds v. Wise*, 375 F.Supp. 145 (N.D.Tex.1974).

**37.** 164 U.S.App.D.C. 86, 503 F.2d 177 (D.C.Cir. 1974).

**38.** 488 F.2d 714, 7 F.E.P. Cases 1 (5th Cir. 1974).

**39.** 42 U.S.C. § 2000e–5(k) (1970).

**40.** Appellees invoked essentially such a standard of compensation in their original request for fees before the trial court. *See* App. vol. 2 at 95 (multiplying total number of hours expended by counsel, times hourly fee charged for usual business services).

**41.** The award conferred in the present case, though undoubtedly not predetermined, might be classed as "arbitrary" in awarding a round figure of $160,000, which is approximately four-fifths of the total fees requested, *see* text at note 25 & note 25 *supra*, and which is not a sum arrived at through a sufficiently reasoned process, *see* text at notes 61–63 & notes 61–63 *infra*.

not easy to make, the costs awarded must bear close relation not to the depth of the "pocket" from which attorneys' fees are to be withdrawn, but to the individual and social benefits that accrue—or that in the course of litigation appeared reasonably likely to accrue—from the attorneys' services and from the litigation. We conclude that the intent of Congress that in Title VII litigation the United States "shall be liable for costs the same as a private person" can best be carried out by recourse to these standards.

■ Considerations additional to the above may also assist the trial court in making a more precise calculation—more precise and therefore more fair to the private law firm, to its clients (both present and future), and to the Government and its taxpayers. While the Government has urged that a maximum $40 per hour fee be allowed to attorneys for a prevailing party in Title VII litigation,[42] we believe that a trial court should reasonably conclude that a single, unalterable, maximum hourly fee would prove too rigid as the starting point for calculations of fees to be awarded to all attorneys for all phases of work in each Title VII case. An alternative approach is needed.

### B.

One of the striking features of this and similar cases is that the law firm asserting the value of its attorneys' work to the client, to be paid for by the Government, never reveals the value of the attorneys' work to the firm, i. e., the value of the gross income brought to the firm by the attorneys in the ordinary course of business, as compared with the sums paid out to those attorneys as personal income and to defray overhead costs attributable to the maintenance of the attorneys in the firm. Yet these calculations are at the heart of the firm's own accounting processes as a business concern, and should also be considered by a court when called upon to exercise judgment in determining a reasonable attorneys' fee.

Thus the trial court should give consideration to abandoning the traditional claimed hourly-fee starting point for its calculations in favor of a principle of reimbursement to a firm for its costs, plus a reasonable and controllable margin for profit. Such a principle can be applied through separation of the several hidden components of the usual attorneys' fee.

In setting a fee for the services of a law firm *associate*, at least three types of sums must be sought to be recovered by a firm: the salary paid to the associate, overhead costs (including rent, supplies, services, secretarial and para-legal help), and a return of profit to the partnership. For the services of a *partner*, separate categories of salary and return of profit are combined into one, to which must be added all the overhead costs (which may be greater for a partner than for an associate). Most firms keep a tally of the number of hours billed and the rates charged by each attorney in a particular year, and hence could compute the dollar amount of gross earnings billed by a particular attorney, whether partner or associate. The dollar amounts for each element—individual overhead, associate's salary or partner's equivalent service compensation, and profit (if any)—can then be calculated on an individual basis, annually or hourly. From these figures the court can determine what the firm *usually* receives for an individual attorney's services on an hourly basis for regular commercial clients, and thus have a much sounder basis from which to calculate what the firm *should* receive in Title VII litigation, taking into consideration other relevant factors identified in *Evans* and discussed herein.

■ To compensate a law firm for services rendered by an associate in Title VII litigation, the trial judge should make an accurate appraisal of the number of hours and type of work performed in a particular case, and then reimburse the firm for that share of each associate's hourly fee equivalent to the associate's overhead and salary

42. Brief for Appellant at 39 n.26.

plus a certain margin for profit, if the firm customarily bills for that associate's services at a rate high enough to create a profit. In the case of a firm that charges very high hourly rates to its private clients, the margin for profit to be recovered to the firm for hours logged by an associate in a Title VII case against the Government could reasonably be smaller than that recovered for services rendered by an associate to the firm's highest-paying clients. On the present record we do not venture to suggest specifically what such a reasonable margin for profit should be; this should be explored by the trial judge, and specifically identified along with the items of salary and overhead.

■ In the case of partners, the calculus above should be adjusted to take account of the fact that all income earned by any partner above that chargeable to overhead may be considered to be "profit" available for distribution according to partnership shares, since no fixed salary is paid to a partner. Therefore, a court might choose to consider the hourly fees that it determines should be recovered in a Title VII case by the highest paid associates of a firm as a base line from which partners' fees could be extrapolated upward.

The method of awarding fees that we propose here would involve more work on the part of the trial court than making a gross "guesstimate," since it involves adducing specific evidence and making calculations thereon. For example, to apply this method in the present case, the court below would need to seek new information concerning attorneys' salaries, overhead costs, and what a reasonable margin for profit should be. Yet the new approach should yield a far more equitable and supportable result. Inflated hourly fees would be avoided as a basis for awards of attorneys' fees in Title VII cases, and, instead, computation would begin with consideration of sums required for reimbursement of attor-

neys for their investment of time and facilities, plus an identifiable and *controllable* margin for profit. In cases with a public interest dimension, courts ·have frequently stated that as an incentive to take such cases some margin for profit should be allowed to attorneys on the prevailing side,[43] though courts in these cases have calculated in a manner different from the one we suggest here the base line recovery figure to which the margin for profit is added.

■ It should be observed that the calculation of the elements of personal return for services, overhead, and profit (if any) for an attorney's work in the usual commercial cases cannot of itself determine an appropriate fee in a Title VII case, for such a determination would apply blindly commercial hourly rates to a Title VII case without evaluation by the trial judge of all the others factors applicable to this type of litigation. What the attorney actually earns for himself and for his firm in normal commercial practice provides only an initial reference point—perhaps in most Title VII cases an outside limit.

After the trial judge has categorized and winnowed down the raw number of hours of work claimed for each individual attorney, assessed the value to the client of the results achieved, and considered the other service "quality" factors discussed herein and in *Evans*, he can then calculate for this particular Title VII case the elements of personal return for services, overhead, and profit to the firm as a guide to fixing the fee. Overhead would normally be a fixed figure, the same as in a commercial case. Personal services would bear some relationship to the salary paid to the individual attorney at an hourly rate, and might be valued more or less than salary, depending on the trial judge's previous evaluation of the service quality factors. Profit to the firm is largely determined by the trial judge's previous evaluation of the quality factors regarding personal services in this

---

**43.** *See Pete v. United Mine Workers of America Welfare and Retirement Fund of 1950,* 170 U.S.App.D.C. 437, 451, 517 F.2d 1275, 1290 (1975); *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 471 (2d Cir. 1974) (proposing fee adjustment according to "risk of litigation"); *Parker v. Matthews,* 411 F.Supp. 1059, 1068 (D.D.C.1976), *aff'd, Parker v. Califano, supra.*

particular case, leavened perhaps by a reference back to the firm's earnings performance on other legal business. The process we describe differs very little from the steps a conscientious managing partner would take in fixing a fee for a client of not unlimited resources whom the firm had definitely benefited through the services of its attorneys, in evaluating the fairness of a fee to the firm and to the client. The trial judge, however, has one aid to a just decision the managing partner does not—the adversary process, which can serve to illuminate conflicting factors.[44]

### C.

This court has stated that "considerable deference" must be shown to a trial court in the exercise of its discretion in setting attorneys' fees,[45] and that in Title VII cases "abuse of discretion" is the standard of review.[46] Nevertheless, this court has not hesitated to set aside an award of attorneys' fees by a district court where the record did not fully elucidate the factors that contributed to the court's fee decision.[47] Similarly, the Third Circuit has stated explicitly that in setting attorneys' fees, "failure to adhere to proper standards and to follow appropriate procedures would con-

stitute abuse of the district court's discretion . . . ."[48]

We now turn to consider each of the two major areas in the court's record and deliberations which will require additional attention on remand.

### III. INADEQUACY OF THE EVIDENTIARY FOUNDATION

Appellees in their initial request for fees sought compensation for 3,602 hours of attorney time, charged at the "normal billing rates" of the attorneys' Washington, D.C., law firm.[49] Appellant has appropriately pointed out, however, that appellees failed to distinguish in their billing charges among the various types of legal services provided.[50] The same hourly billing rate is charged across the board for every kind of legal activity in which the attorneys engaged, such as taking depositions, preparing and answering interrogatories, settling claims, and preparing for and appearing at trial.[51] Most critically, attorneys for the appellees failed to differentiate between time spent appearing in court and time spent out of court. The importance of this particular distinction has been recognized by other courts.[52] It is common knowledge

---

**44.** *See* text at note 94 & note 94 *infra*.

**45.** *See Pete v. United Mine Workers of America Welfare and Retirement Fund of 1950, supra*, 170 U.S.App.D.C. at 450, 517 F.2d at 1289. *See also Lea v. Cone Mills Corp.*, 467 F.2d 277, 279 (4th Cir. 1972), *quoting United States v. Anglin & Stevenson*, 145 F.2d 622, 630 (10th Cir. 1944), *cert. denied*, 324 U.S. 844, 65 S.Ct. 678, 89 L.Ed. 1405 (1945) (". . . [A]n appellate court is not warranted in overturning the trial court's judgment unless under all of the facts and circumstances it is clearly wrong.").

**46.** *Evans v. Sheraton Park Hotel, supra*, 503 F.2d at 187. *See also Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 126 (8th Cir. 1975), *cert. denied*, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); *Johnson v. Georgia Highway Express, Inc., supra*, 488 F.2d at 717.

**47.** *Evans v. Sheraton Park Hotel, supra*, 503 F.2d at 188.

**48.** *Lindy Bros. Builders, Inc. of Phila. v. American Radiator & Standard Sanitary Corp.*, 487

F.2d 161, 166 (3d Cir. 1973) [hereinafter cited as *Lindy I*].

**49.** App. vol. I at 95; Brief for Appellees at 22.

**50.** Brief for Appellant at 17.

**51.** App. vol. II at 103–42. Appellees itemized their billing charges only according to the several broad stages of the litigation, such as discovery and trial preparation. *Id.* at 93. These distinctions, however, are not convincingly drawn, *see* Brief for Appellant at 11, and in any event are not detailed enough to satisfy the court's need for information concerning time spent on particular types of legal activities within each stage of litigation.

**52.** *See, e. g., McCormick v. Attala County Bd. of Educ.*, 424 F.Supp. 1382, 1388 (N.D.Miss. 1976) ("Necessarily, time spent in court should carry a higher rate than time spent in preparation for trial."); *Reynolds v. Wise, supra*, 375 F.Supp. at 152 (citing different minimum fee rates for time spent in and out of court).

Similarly, a petitioner's claim for attorneys' fees in a private antitrust action has been criti-

that billing fees of law firms are often adjusted to take into account a variety of specific factors and circumstances, including the type of legal activity for which a client is being charged. If the trial court is not satisfied that such is the customary practice in this jurisdiction or in the case of this particular firm, or if additional information is needed concerning the details of this practice and its proper application to the fee request at issue here, the record should be supplemented so that any necessary adjustments in the award can be made.[53]

The lack of particularized billing information in the record of this case also makes it impossible for this court to ascertain whether or to what extent the fee requests submitted by appellees should be reduced for reason of duplication of efforts by appellees' attorneys ("multiple billing").[54] Two attorneys for the appellees stated in affidavits that they had reduced their requests for fees because of such duplicative efforts.[55] Yet the record of attorney time spent, organized only by monthly periods with no itemization for particular activities on particular days, is not sufficiently detailed to allow for verification of whether such reductions for reason of multiple billing have been made to an adequate extent.

We do not wish to overburden appellees or the trial courts with the task of compiling and processing massive amounts of billing data, or to set a standard of proof in reporting charges that is so high as to discourage attorneys from pursuing litigation in the public interest. But attorneys in private practice are accustomed to keeping careful records of hours, and even of minutes, expended in providing legal services for clients. Certainly if a client with ongoing business in a firm sought detailed itemization of fees charged in a case of this magnitude, the attorneys involved would not hesitate to comply. No less consideration than that afforded a private client should be shown when fees are charged against the United States.

Contrary to the assertion of the trial court in its opinion in this case, the United States does not have "infinite ability to pay."[56] Without the exercise of billing judgment and careful reporting of fees by attorneys on the prevailing side, it is impossible for a court to exercise careful judgment in determining what in a particular case constitutes a reasonable fee and to protect the treasury of the United States from unwarranted invasion. If the federal fisc is not protected by the judiciary against unreasonable encroachment by fellow members of the legal profession, there may be a public and congressional reaction against allowing attorneys' fees to the party prevailing against the Government in Title VII actions.

---

cized by an appellate court on the ground that "no breakdown" was provided "of any of the time claimed into the various facets of the case" and "[i]t is conceivable that large amounts of time could have been spent on comparatively routine matters or in ministerial duties." *City of Detroit v. Grinnell Corp.,* supra, 495 F.2d at 473. *See also Johnson v. Georgia Highway Express, Inc.,* supra, 488 F.2d at 717 ("[I]t is appropriate to distinguish between legal work, in the strict sense, and investigation, clerical work, compilation of facts and statistics and other [non-legal] work . . . ."); *Lindy I,* supra, 487 F.2d at 167 ("[T]he court may find that the reasonable rate of compensation differs for different activities.").

53. The best way to supplement the record on this issue may be to hold a hearing. *See* text at note 94 & note 94 *infra.*

54. Both courts and commentators have noted the need to scrutinize billing requests carefully to take account of multiple billing. *See, e. g., Union Central Life Ins. Co. v. Hamilton Steel Products, Inc.,* 493 F.2d 76, 80 (7th Cir. 1974) (fee requests of attorneys reduced because of duplication of effort); *Johnson v. Georgia Highway Express, Inc.,* supra, 488 F.2d at 717 ("The time of two or three lawyers in a courtroom or conference when one would do, may obviously be discounted."); Dawson, *Lawyers and Involuntary Clients in Public Interest Litigation,* 88 Harv.L.Rev. 849, 927 (1975) (courts expected to inquire into duplication of effort by attorneys).

55. App. vol. II at 95, 104, 110 (total of 19 hours excluded, compared to 3,602 claimed).

56. *Copeland, et al. v. Usery,* supra, slip op. at 3.

We follow ample precedent in remanding this award of attorneys' fees for reason of the award's insufficient evidentiary foundation.[57]

## IV. INADEQUATE WEIGHING OF THE RELEVANT FACTORS BY THE TRIAL COURT

██ We do not minimize the rather baffling array of factors which a court is required to take into consideration in setting attorneys' fees in Title VII as in other types of litigation.[58] Yet the task is not made less important by its complexity or by the undefined weight assigned to each of the factors involved. Instead, the wide range of discretion that is allowed a court in weighing these factors makes it all the more important that the court explicate clearly the effect of each factor in leading it to increase or decrease the award, and the relative weight it assigns to each factor in reaching a final determination.[59] As one commentator has pointed out, a court in setting attorneys' fees in public interest litigation must do more than "preserve decorum, turn the wheel and when it stops redeem the winner's chips at the posted rates." [60]

Though we have not been left completely in the dark [61] by the trial court concerning the reasons for its award, scant light is shed by its bald assertion, for example, that its award was made after "[t]aking into account each of the factors itemized in *Evans v. Sheraton Park Hotel . . . .*" [62] To complement this statement one finds in the opinion only the most sketchy discussion of several of those factors. We seek not a lengthy opinion,[63] but one that examines

**57.** *See, e. g., Grunin v. Int'l House of Pancakes, supra,* 513 F.2d at 126 (case remanded because award of attorneys' fees based on "insufficient specific evidence regarding the time spent on this litigation"); *City of Detroit v. Grinnell Corp., supra,* 495 F.2d at 471 (valuation of hours spent by attorneys requires "fairly definite information as to the way in which that time was spent . . ."); *Lindy I, supra,* 487 F.2d at 167 (without information as to the "hours devoted to various general activities . . . the court cannot know the nature of the services for which compensation is sought."). *See also* Dawson, *supra* note 54, at 927 (if time spent is to be central factor in awarding attorneys' fees, "careful records and clear proof" are required of attorneys).

**58.** *See Evans v. Sheraton Park Hotel, supra,* 503 F.2d at 187–88 (listing twelve guidelines). Decisions which repeat these factors without analysis have been criticized as producing "meaningless litanies," Dawson, *supra* note 54, at 927, since judges must balance the factors "without knowing what weight to assign to each," *id.* at 930. *Cf. City of Detroit v. Grinnell Corp., supra,* 495 F.2d at 470 ("conceptual amalgam" of factors is "so extensive and ponderous that it is probably not employed in any precise way"; a list of factors "standing alone . . . can never provide meaningful guidance.").

**59.** *See City of Detroit v. Grinnell Corp., supra,* 495 F.2d at 473, citing *Lindy I, supra,* 487 F.2d at 169 (need for district judge to "set forth as specifically as possible the facts that support his conclusion"); *Johnson v. Georgia Highway Express, Inc., supra,* 488 F.2d at 717 (pointing out inadequacy in trial court order that "does not elucidate the factors which contributed to the decision and upon which it was based"). Care should be shown by a trial court in scrutinizing and justifying an award of attorneys' fees against a non-prevailing government party, as against other non-prevailing parties, in part because the usual incentive that exists for a law firm to charge only reasonable attorneys' fees is absent when fees are charged against an opposing party. The attorneys of the prevailing party are certain to have no continuing business relationship with a non-prevailing party, and thus such attorneys need fear no future loss of business to the firm if the fees they seek from that party are unreasonable. Attorneys are not excused from exercising billing judgment in charging fees of an opposing party, but a trial court must be prepared to exercise such judgment if the attorneys fail. An appellate court, in turn, can ascertain whether a trial court has properly exercised such judgment only if the trial court has spelled out the reasons for its award with thoroughness.

**60.** Dawson, *supra,* note 54, at 930.

**61.** *See Evans v. Sheraton Park Hotel, supra,* 503 F.2d at 188 (award of attorneys' fees remanded because appellate court "completely in the dark" as to trial court's findings).

**62.** *Copeland, et al. v. Usery, supra,* slip op. at 3.

**63.** We do not, for example, seek an exhaustive review of every line item of attorneys' fees requested. *Cf. Commonw. of Pennsylvania v. O'Neill,* 431 F.Supp. 700 (E.D.Pa.1977).

the contending arguments with greater care.[64]

In support of its award of fees, the District Court makes a number of observations concerning the contribution of appellees' attorneys to the successful disposition of this litigation. The court notes, for example, that this was an action that achieved results which "cannot be measured solely in monetary terms" and which "will be felt for many years to come";[65] that serious issues were at stake in the case and the litigation was "hard fought";[66] that the discovery process was opposed and impeded by the Government;[67] that appellees' attorneys were "always well prepared, effective and knowledgeable," even though they lacked trial experience;[68] and that "[n]o time was deliberately wasted."[69]

Yet the court in just one sentence disposes of the issue of the conformity of the hourly fees charged by appellees' attorneys with those customarily charged in this jurisdiction.[70] Furthermore, there is no evidence that we can find in the record to support the court's assertion that the hourly fees charged in this case were in line with fees charged by others, for the survey of legal fees introduced by appellees indicates that the hourly fees charged by at least two of appellees' attorneys were too high.[71]

The court also should make clear which level of "customary fees" it is holding up as a standard of comparison with the fees charged in this case. A standard of unadjusted maximum fees charged by major Washington, D.C., law firms to their large corporate clients for representation before a federal agency, for example, is not the appropriate measure for fees to be charged *against* a federal agency as compensation for services rendered to an individual or class of individuals in pursuing a claim under Title VII.[72] We find no support in either legislative history or case law for the notion that, when Congress provided for liability of the United States in Title VII litigation, it intended that the United States should be liable to pay, on an unadjusted basis, the *highest* fee rates charged by the prevailing attorneys to other clients for services on matters unrelated to a Title VII claim.[73] The primary purpose of the attorney fee provision of Title VII is to facilitate the pursuit of employment discrimination litigation, and only ancillarily to compensate attorneys. The high fees often charged to parties in the world of private business are surely higher than those required to provide an incentive to

---

64. For example, the trial judge who issued the opinion which we are reviewing here has set a sounder foundation for possible review in a recently decided case with similar issues. *See Cayce v. Adams,* No. 77–0049 (D.D.C. 30 Mar. 1978) (Gesell, J.).

65. *Copeland, et al. v. Usery, supra,* slip op. at 2.

66. *Id.*

67. *Id.*

68. *Id.* at 3.

69. *Id.*

70. The court noted merely that "The average of $57.17 an hour [sought by appellees' attorneys] is well within the local range for associates of larger firms which is between $25.00 an hour on the bottom side to perhaps as much as $75.00 per hour on the top side." *Id.* at 2–3.

71. Both associates on the case, who together logged more than 80% of the total number of hours, sought higher hourly fees than the maximum hourly fee reportedly charged by associates in the firms surveyed. *See* App. vol. II at 95, 143. *Cf.* Table: Attorneys' Fees Awarded in Civil Rights and Similar Cases, App. vol. II at 145–49.

72. Other courts, for example, have used "minimum" fee schedules as a guide in awarding attorneys' fees in employment discrimination cases. *See Johnson v. Georgia Highway Express, Inc., supra,* 488 F.2d at 717; *Reynolds v. Wise, supra,* 375 F.Supp. at 152.

73. For legislative history, see Civil Rights Act of 1964 (Pub.L. No. 88–352), S.Rep. No. 872, H.R.Rep. No. 914, 88th Cong., 2d Sess., *reprinted in* [1964] U.S.Code Cong. & Admin.News 2355; Equal Employment Opportunity Act of 1972 (Pub.L. No. 92–261), S.Rep. No. 92–415, H.R.Rep. No. 92–238, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Admin. News p. 2137.

members of the private bar to pursue Title VII claims with vigor.[74]

· Indeed, there would be great inequity in allowing each attorney on the prevailing side of a Title VII case to recover fees from the Government at the maximum rate that such attorney customarily charges clients in other, unrelated lines of legal work. For there is no reason to believe that expertise in a field of corporate regulatory work, to provide just one example, is translatable directly into expertise in pursuing Title VII litigation. Likewise, there is no reason to believe that a lawyer who is an acknowledged expert in one area of law and who bills his clients accordingly will provide legal services more valuable to a party and to society in a Title VII case than would an attorney who works for a public interest firm and who charges no fixed hourly rate, or who charges a rate far lower than that of other attorneys of the private bar. Thus

the trial court should exercise close scrutiny to prevent the widely divergent and often escalated fees charged by some members of the private bar, in areas of the law unrelated to those involved here, from becoming the standard of recovery from a government defendant.[75]

In short, therefore, on the issue of customary fees, the trial court in this case should (1) require the submission of more complete data concerning legal fees customarily charged in this jurisdiction in a variety of settings and substantive areas of law; and (2) employ a formula such as the one we outlined in Part II, *supra*, for the computation of reasonable compensation for attorneys in Title VII cases that does not mechanistically set as its cornerstone the "customary" and unadjusted fees charged by private attorneys in their unrelated and most highly paid lines of work.

**74.** As the trial judge in this case noted in an earlier case on the issue of attorneys' fees:

. . . The attorney [involved in public interest litigation] should be paid an adequate fee for his work but that is all. . . . Those lawyers who choose the commendable course of serving the public interest rather than building a more remunerative commercial practice cannot expect the same financial awards as such practitioners sometimes achieve. The law is not a money-grubbing profession; windfalls should not be given to those who successfully represent persons not properly treated by our Government. . . *It would be a gross mistake to make the highest level of charges in the private sector a measure of compensation to be paid all attorneys who seek to vindicate an identifiable public interest.*

*Nat'l Council of Cmty. Mental Health Centers, Inc. v. Weinberger, et al.,* 387 F.Supp. 991, 997 (D.D.C.1974) (Gesell, J.), *rev'd on other grounds,* 178 U.S.App.D.C. 237, 546 F.2d 1003 (1977), *cert. denied,* 431 U.S. 954, 97 S.Ct. 2674, 53 L.Ed.2d 270 (1977) (emphasis added).

**75.** At least one district court in a Title VII case has recognized that hourly legal fees charged by a major city law firm may be excessive when sought from a public agency. *See McCormick v. Attala County Bd. of Educ., supra,* 424 F.Supp. at 1388 ("[W]e expressly decline to put our stamp of approval on the ridiculous claims [of up to $80 per hour] made by the Washington law firm [retained by the prevailing party] for legal services rendered in this case."). *See also Johnson v. Georgia Highway Express, Inc., supra,* 488 F.2d at 719 (in Title

VII case, courts have no mandate to "make the prevailing counsel rich"); *Nat'l Council of Cmty. Mental Health Centers, Inc. v. Weinberger, et al., supra,* 387 F.Supp. at 997 ("Some legal fees in the private sector are excessive."). *Cf.* ABA Code of Professional Responsibility, Canon No. 2, EC 2–17 ("A lawyer should not charge more than a reasonable fee. . . .").

It is not our intent to establish a sub-class of fees payable for Title VII litigation or to relegate, in any way, the vindication of Title VII rights to second-class status. To do so, obviously, would run counter to the very purpose for which Title VII was enacted. *See* text at note 34 & note 34 *supra.* But it is our intent to resist the imposition on the public sector of the highest standards of legal remuneration adopted in the private sector—standards which are out of line with the ethic of public service with which attorneys are encouraged to engage in public interest litigation, and which may even risk turning the public against the very provisions for the award of attorneys' fees on which appellees rely in this case. *See* text at notes 56–57 *supra. Cf. City of Detroit v. Grinnell Corp., supra,* 495 F.2d at 469 (to protect integrity of legal profession, courts should "avoid awarding 'windfall fees' and . . . every appearance of having done so."); C. Wright & A. Miller, Manual for Complex Litigation, Part I, § 1.47 at 65 (1977 ed.) (attorneys' fees in class actions should be awarded to "provide compensation sufficient to stimulate the motive for representation of classes" while avoiding "abuse.").

The District Court also has failed to consider whether the award of attorneys' fees in this case is in line with net awards made in similar cases.[76] Appellant has alleged that the award in this case is ten times the average award in Title VII cases,[77] while appellees contend that many courts in Title VII cases have not hesitated to make larger net awards than the one made here, where substantial legal efforts were required to enforce a party's rights.[78] Both parties have introduced tables and charts to support their divergent contentions.[79] It is not for an appellate court to ascertain which of the many "similar cases" cited by the parties may best be compared with the present case for the purpose of comparing awards of attorneys' fees. This is a task for which the trial court is much better equipped and in which it presumably will engage on remand.

Further consideration should also be given by the trial court to whether the fees charged by appellees' attorneys bear close relation to results achieved in the litigation[80] and to the time and labor required in its pursuit.[81] Appellant has forcefully contended that the investment of time by appellees' attorneys in several phases of the litigation in the present case, especially in discovery and trial preparation, was excessive and not justified by the results.[82] For example, appellant charges that unnecessarily broad and unfocused discovery motions by appellees let loose a "blizzard" of government papers that contained an "incredible amount of useless information" that took appellees' attorneys far more time to process than should now be charged to the Government.[83] Appellant also argues that the most substantial relief afforded appellees by this litigation was achieved early, at the administrative level, and that the net financial value of the final relief obtained was not great.[84] Appellees argue in response that difficulties encountered at the discovery phase were the result of various acts of noncooperation by appellant,[85] that relief won early in the proceedings was not "meaningful,"[86] and that the lifetime pecuniary value of the gains achieved by appellees as a class is substantial.[87] Appellees also contend that pecuniary gains are, in any event, not the best measure of results gained in an action that seeks to vindicate civil rights.[88]

The District Court is correct in stating that monetary gains to a prevailing party are not the sole basis for setting a fee award in a Title VII case,[89] and in affirming that the serious issues at stake in this case were worthy of hard-fought efforts at

**76.** Like the factor of customary hourly fees, consideration of awards made in similar cases is prescribed in *Evans* as a guide to setting attorneys' fees under Title VII. *See Evans v. Sheraton Park Hotel, supra,* 503 F.2d at 188.

**77.** Brief for Appellant at 13.

**78.** Brief for Appellees at 45.

**79.** *See* Brief for Appellant at 42–49; App. vol. II at 145–49 (table filed by appellees).

**80.** *See Evans v. Sheraton Park Hotel, supra,* 503 F.2d at 187.

**81.** *Id.* Though the number of hours expended by an attorney is a necessary starting point for consideration by a trial court, *see City of Detroit v. Grinnell Corp., supra,* 495 F.2d at 470 (objectivity requires anchoring analysis to time expended), its importance goes no further than that, *see Pete v. United Mine Workers of America Welfare and Retirement Fund of 1950, supra,* 517 F.2d at 1292 (final time logs used only

as basis before discounting and applying fee formula). Waste of time, exercise of poor legal judgment, and duplicative efforts, for example, must always be considered in paring down the number of hours expended to yield the number of hours *required,* which is the maximum time compensable.

**82.** *See* Brief for Appellant at 31–32.

**83.** *Id.* at 31.

**84.** *Id.* at 32–34.

**85.** Brief for Appellees at 7–11.

**86.** *Id.* at 4.

**87.** *Id.* at 41–42.

**88.** *Id.* at 42.

**89.** *Copeland, et al. v. Usery, supra,* slip op. at 1–2.

vindication.[90] Nevertheless, the court makes no effort to evaluate whether each major phase in the litigation was conducted by appellees' attorneys in a manner so efficient and expeditious and with an outcome sufficiently worthy (or reasonably likely to be worthy) as to justify the fees charged for the conduct of each phase. Hindsight views can prove unfair in comparing effort exerted with results achieved, and it must not be expected that every hour of legal time will be expended with maximum efficiency and for maximum gain. Yet the analysis conducted by the court—hindered as it must have been by inadequately particularized billing information—does not probe deeply enough into the serious issues raised concerning the exercise of judgment by appellees' attorneys in investing time, and billing for time, in each of the major phases of this litigation.[91]

The trial court also notes only briefly one of the other factors to be considered in setting attorneys' fees: the degree of experience of the attorneys involved.[92] Appel-

lant points out that the two principal attorneys involved with this case were both young associates who had little prior experience in litigation or in the area of Title VII.[93] The court states that this lack of trial experience was "offset by other factors," such as the attorneys' preparation, effectiveness, and knowledge.[94] While this may well be the case, and though experience and age may not be the best indicia of an attorney's general ability and contribution to a case, we do not believe that the trial court's brief disposition of this matter adequately applies the factor adopted in *Evans*.

## CONCLUSION

No evidentiary hearing has yet been held in this case on the question of attorneys' fees. In view of the inadequate evidentiary foundation that exists for a court's deliberations and the many issues that remain unresolved, the trial court should give serious consideration to holding a hearing to supplement and further clarify its record.[95]

**90.** *Id.* at 2.

**91.** The trial court also has not made clear whether it has awarded fees in this case for time spent by appellees' attorneys in pursuing appellee's claim at the administrative level, prior to the filing of a complaint in the District Court. This Circuit has recently held that a trial court has discretion in a Title VII case to make such an award. *Parker v. Califano, supra,* 561 F.2d at 321, 333. On remand, the trial court should consider whether its award is consistent with this holding and specify the fees, if any, that either have been or should be awarded for the early stages of this proceeding. *See Johnson v. Georgia Highway Express, Inc., supra,* 488 F.2d at 717 (award of attorneys' fees remanded in part because of unexplained disallowance).

**92.** *See Evans v. Sheraton Park Hotel, supra,* 503 F.2d at 187. *See also Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102, 117 (3rd Cir. 1976) (counsel with greater experience, knowledge, and legal talent command higher hourly rates); *Johnson v. Georgia Highway Express, Inc., supra,* 488 F.2d at 719 (attorney specializing in civil rights may receive larger compensation than attorney without such specialty). The trial judge who issued the opinion which we review here has also noted in another case that: "Attorneys specializing in  .  .  . [civil rights cases against the Government] are

often inexperienced in federal trial practice.  .  .  . Lawyers inexperienced in trial practice, though bright and conscientious, often do not make efficient use of time. They go through a learning process that should not be charged to the United States." *Cayce v. Adams, supra,* slip op. at 5–6.

**93.** Brief for Appellant at 35–36.

**94.** *Copeland, et al. v. Usery, supra,* slip op. at 3.

**95.** Many appellate courts have ordered a court to hold an evidentiary hearing on questions relating to attorneys' fees. *See City of Detroit v. Grinnell Corp., supra,* 495 F.2d at 468 (evidentiary hearing imperative to "provide sufficient information" for "fair and adequate" award); *Lindy I, supra,* 487 F.2d at 169–70 (evidentiary hearing required because of likelihood of disputed and incomplete facts in the record); *Thomas v. Honeybrook Mines, Inc.,* 428 F.2d 981, 988–89 (3rd Cir. 1970), *cert. denied,* 401 U.S. 911, 91 S.Ct. 874, 27 L.Ed.2d 809 (1971). In other cases, a trial court has held such a hearing on its own initiative. *See Grunin v. Int'l House of Pancakes, supra,* 513 F.2d at 126 (hearing by district court adds weight to fee award); *Johnson v. Georgia Highway Express, Inc., supra,* 488 F.2d at 715 ("appropriate" for trial court to have held hearing); *Clark v. American Marine Corp.,* 320 F.Supp. 709,

The opportunity which such a hearing would create for further presentation of facts and for cross-examination concerning the many disputed issues could greatly aid the trial court's determination of reasonable attorneys' fees and also our ultimate review, should such be necessary.

Attorneys for appellees have performed an important service in litigating the present case with determination and vigor through its many phases from 1973 to today. It is both appropriate and important that they be compensated for their efforts and that others be encouraged to follow suit. Yet, as noted by the trial court, appellees failed to exercise "billing judgment" in filing their unadjusted claim for fees,[96] and we are not convinced that the trial court

has reasoned its way to a principled, lower fee—a result, in part, of the inadequacy of the record, and perhaps also of guiding standards.

On the basis of the record in this case, no specific award of fees can yet be made. The principles we set down here, along with additional evidence to be adduced, should assist the District Court in reaching a more solidly validated conclusion. The case is

*Remanded.*

712 (E.D.La.1970), *aff'd*, 437 F.2d 959 (5th Cir. 1971) (two hearings held by trial court). *Cf. Commonw. of Pennsylvania v. O'Neill, supra*, 431 F.Supp. at 703 (evidentiary hearing on issue of attorneys' fees not held, in part, because of thorough documentation in record). The Supreme Court also has noted the value of a hearing to supplement the record concerning an application for attorneys' fees filed under § 4 of the Clayton Act. The Court noted: "The

amount of the award for such services should, as a general rule, be fixed in the first instance by the District Court, *after hearing evidence* as to the extent and nature of the services rendered." *Perkins v. Standard Oil Co. of Cal.*, 399 U.S. 222, 223, 90 S.Ct. 1989, 1990, 26 L.Ed.2d 534, 536 (1970) (emphasis added).

**96.** *Copeland, et al. v. Usery, supra*, slip op. at 3.