[L.A. No. 31496. Oct. 28, 1982.]

JOHN SERRANO, JR., et al., Plaintiffs and Appellants, v.
JESSE M. UNRUH, as State Treasurer, et al., Defendants and Appellants.

**Counsel**

Sidney M. Wolinsky, John E. McDermott, Richard A. Rothschild, Fred H. Altshuler, Stephen P. Berzon, Michael Rubin and Altshuler & Berzon for Plaintiffs and Appellants.

David B. Roe, Terry Smerling, Fred Okrand and Mark D. Rosenbaum as Amici Curiae on behalf of Plaintiffs and Appellants.

George Deukmejian, Attorney General, and John J. Klee, Jr., Deputy Attorney General, for Defendants and Appellants.

John H. Larson, County Counsel (Los Angeles), and Frederick R. Bennett, Principal Deputy County Counsel, as Amici Curiae on behalf of Defendants and Appellants.

**Opinion**

NEWMAN, J.—The principal question in this appeal and cross-appeal is whether a fee award under a private-attorney-general theory (Code Civ.

Proc., § 1021.5) properly compensates counsel for fee-related services.[1] We conclude that, absent circumstances rendering an award unjust, the fee should ordinarily include compensation for all hours reasonably spent, including those relating solely to the fee. We thus affirm the principal award here and remand for reconsideration that portion of the trial court's order which denied compensation for services on the fee motions.

This is another episode in the landmark *Serrano* litigation that began with an action filed in 1968 as an equal protection challenge to the financing of public schools.[2] It was initiated by a class of children and parents against (1) the State Treasurer, the Superintendent of Public Instruction, and the State Controller in their capacities as state officials (state defendants),[3] and (2) several school districts and officials thereof (county defendants).

The superior court sustained demurrers to the complaint and dismissed. We reversed and remanded for trial. (*Serrano I, supra,* 5 Cal.3d at p. 619.) In September 1974, following an extended trial, the court (Bernard Jefferson, J.) entered judgment for plaintiffs, ruling that the financing system violated equal protection and ordering that the system be brought into compliance within six years of judgment.

Within a month of judgment and before county defendants appealed, plaintiffs' attorneys filed separate motions for fee awards against state

[1] Section 1021.5, a codification of the private-attorney-general fee doctrine set forth in judicial opinions (see, e.g., *Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917, 934 [154 Cal.Rptr. 503, 593 P.2d 200] [*Woodland Hills II*]), provides: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities, and no claim shall be required to be filed therefor."

The statute appears dispositive of this appeal, which is from an award on August 13, 1979. We note, however, that the award was made pursuant to a remand in *Serrano* v. *Priest* (1977) 20 Cal.3d 25 [141 Cal.Rptr. 315, 569 P.2d 1303] (*Serrano III*), holding that California courts have jurisdiction to award attorney fees on a private-attorney-general theory to persons who have vindicated important constitutional rights. *Serrano III* was filed four days after the statute was signed (Sept. 30, 1977, eff. Jan. 1, 1978) and had a reach narrower than that of the statute. Nonetheless the criteria set forth were substantially the same as those the Legislature prescribed. (*Id.,* at p. 49.)

[2] See *Serrano* v. *Priest* (1971) 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241] (*Serrano I*); *Serrano* v. *Priest* (1976) 18 Cal.3d 728 [135 Cal.Rptr. 345, 557 P.2d 929] (*Serrano II*); *Serrano III, supra,* 20 Cal.3d 25.

[3] State defendants are present holders of those offices: Jesse Unruh, Wilson Riles, and Kenneth Cory. At filing the State Treasurer was Ivy Baker Priest.

defendants.[4] In August 1975 $400,000 each was awarded to Public Advocates and Western Center, as reasonable fees for their representation of plaintiffs through April 1975. The awards were made on a private-attorney-general theory and were computed on findings of the reasonable market value of the services. As the basis, or "touchstone," for that computation, Judge Jefferson used the reasonable hourly rates of each of the public-interest attorneys who worked on the case. He derived the rates from those prevailing for private attorneys of comparable skill, experience, and stature conducting noncontingent class litigation in the Los Angeles area.

State defendants filed an appeal that we transferred to this court and consolidated with the then-pending appeal by county defendants on the merits. After the fee issue was briefed, however, we chose to defer it until judgment on merits (*Serrano II*) was final.

Before our remittitur issued, plaintiffs' attorneys filed motions seeking fees for services (1) in *Serrano II*, (2) in opposing county defendants' unsuccessful petition for certiorari before the United States Supreme Court, and (3) in what became *Serrano III*. *Serrano III*, filed in October 1977, affirmed the award for trial services and remanded the motions with directions that "the award of attorney's fees, if any, shall be made and assessed only against said defendants and appellants appealing in the respective appeal, or such of them as the trial court in the exercise of its equitable discretion shall determine." (*Serrano III, supra,* 20 Cal.3d 25, 50.)

In 1979 the superior court (Deutz, J.) awarded plaintiffs' attorneys (1) fees against county defendants of $74,254.70 ($44,966.50 to Public Advocates, $29,288.20 to Western Center)[5] for services in defending the judgment on the merits (*Serrano II*), (2) partial costs against county defendants of $503.74 for printing the brief in opposition to the petition for certiorari, and (3) fees against state defendants of $39,560 ($31,280 to Public Advocates, $8,280 to Western Center) for defending the fee award (*Serrano III*). In so ruling the court reduced the hours claimed for *Serrano II* by 20 percent and enhanced the touchstone figure[6] by 15 percent. The

---

[4]Plantiffs have been represented by Public Advocates, Inc. (Public Advocates), a nonprofit corporation supported by foundation funds, and Western Center on Law and Poverty (Western Center), established pursuant to the Legal Services Corporation Act (42 U.S.C. § 2996 et seq.). Neither may accept fee-paying clients.

[5]*Serrano III* noted that "[t]he propriety of a direct award to the plaintiffs' attorney, rather than to plaintiffs themselves in the exercise of the court's equitable powers, is no longer questioned in the federal courts. [Citations omitted.] The equity powers of California courts are no less expansive in this respect." (20 Cal.3d 25, 47, fn. 21.)

[6]Under the prevailing view the "touchstone" or "lodestar" figure comes from a "careful compilation of the time spent and reasonable hourly compensation of each

court denied enhancement of the figure for *Serrano III*. All the awards were computed on the basis of the hourly rates set by Judge Jefferson in 1975 with some upward adjustments to reflect increased experience and skill in the interim. The court also denied plaintiffs' motions for services seeking complaince with the dictates of *Serrano II* and preparing the fee motions.

All defendants appealed; plaintiffs' attorneys cross-appealed. County defendants thereafter settled and abandoned their appeal, and plaintiffs' attorneys abandoned that portion of the cross-appeal relating to county defendants. Thus before us now are state defendants' appeal of the $39,560 award to plaintiffs' attorneys for their successful enforcement on appeal of the award granted for prevailing at trial, and plaintiffs' cross-appeal of that portion of the order denying fees for services in preparing the fee motions.[7]

## I. *Fee for services regarding the fee?*

■■ The central issue is whether, under the private-attorney-general theory codified in section 1021.5, counsel's efforts to secure their fee for the underlying litigation may be compensated. Defendants' position is that there should be no award for fee-related services. They argue that plaintiffs' attorneys, in enforcing the award, vindicated no more than their personal interest, one inimical to that of their clients in that every fee awarded reduces *pro tanto* the fund available to defendants to use for public education. Defendants cite cases where fees were awarded under the common-fund or the substantial-benefit theory, viz., *City of Detroit* v.

---

attorney . . . involved. . . ." (*Serrano III, supra,* 20 Cal.3d 25, 48.) The figure may be enhanced or diminished after the court considers matters such as those enumerated in *Serrano III*: "(1) the novelty and difficulty of the questions involved, and the skill displayed in presenting them; (2) the extent to which the nature of the litigation precluded other employment by the attorneys; (3) the contingent nature of the fee award, both from the point of view of eventual victory on the merits and point of view of establishing eligibility for an award; (4) the fact that an award against the state would ultimately fall upon the taxpayers; (5) the fact that the attorneys in question received public and charitable funding for the purpose of bringing law suits of the character here involved; [and] (6) the fact that the monies awarded would inure not to the individual benefit of the attorneys involved but the organizations by which they are employed. . . ." (*Id.,* p. 49, fn. omitted.)

[7]Amicus briefs have been filed by Los Angeles County, the Environmental Defense Fund, and the American Civil Liberties Union of Southern California.

Letters in support of a hearing were received from the Legal Aid Society of San Diego, California Rural Legal Assistance (on behalf of itself, the Legal Aid Foundation of Los Angeles, and the Legal Aid Society of Alameda County), the Center for Law in the Public Interest, the Los Angeles County Bar Association, San Francisco Neighborhood Legal Assistance Foundation, Consumers Union, Public Interest Law Firm of the Santa Clara County Bar Association Law Foundation, the law firm of O'Neill and Huxtable, and Matthew McAlerney, Esq.

*Grinnell Corp.* (2d Cir. 1977) 560 F.2d 1093 (*Grinnell II*), *Lindy Bros. Builders, Inc.* v. *Am. Radiator, etc.* (3d Cir. 1976) 540 F.2d 102 (*Lindy II*), *Gabrielson* v. *City of Long Beach* (1961) 56 Cal.2d 224 [14 Cal.Rptr. 651, 363 P.2d 883], and *Mandel* v. *Lackner* (1979) 92 Cal.App.3d 747 [155 Cal.Rptr. 269] (*Mandel II*). The trial court correctly rejected those precedents as inapposite.

## A. FEE AWARDS IN COMMON-FUND AND SUBSTANTIAL-BENEFIT CASES

Since 1796 the rule in this country has been that counsel fees are not recoverable absent statute or enforceable agreement. (See *Arcamel* v. *Wiseman* (1796) 3 U.S. (3 Dall.) 306 [1 L.Ed. 613]; see also, e.g. Code Civ. Proc., § 1021; *Alyeska Pipeline Co.* v. *Wilderness Society* (1975) 421 U.S. 240, 247-257 [44 L.Ed.2d 141, 147-153, 95 S.Ct. 1612].) Courts have, however, carved out exceptions to the rule, principally the common-fund, substantial-benefit (or common-benefit), and private-attorney-general theories.[8]

The common-fund exception was articulated in *Trustees* v. *Greenough* (1882) 105 U.S. 527 [26 L.Ed. 1157]. *Greenough* held that an act of Congress which limited costs recoverable by prevailing parties did not restrict courts' equitable powers to permit the trustee of a fund, or a party recovering or preserving a fund for the benefit of himself and others, to recover his costs (including attorney fees) from either the fund or the benefited parties directly. "The fee-bill is intended to regulate only those fees and costs which are strictly chargeable as between party and party, and not to regulate the fees of counsel and other expenses and charges as between solicitor and client . . . ." (105 U.S. at p. 535 [26 L.Ed. at p. 1161].)

The central theory underlying the trustee's right was the prevention of unjust enrichment, i.e., "prevention of an unfair advantage to the others who are entitled to share in the fund and who should bear their share of the burden of its recovery. . . ." (*Estate of Stauffer* (1959) 53 Cal.2d 124, 132

---

[8]A fourth principal exception, for bad faith or "vexatious and oppressive conduct" in conducting the lawsuit, is recognized by federal courts. (See, e.g., *Hutto* v. *Finney* (1978) 437 U.S. 678, 691 [57 L.Ed.2d 522, 534-535, 98 S.Ct. 2565]) This court chose not to consider the exception in *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 26-27 [112 Cal.Rptr. 786, 520 P.2d 10]. (See also *Bauguess* v. *Paine* (1978) 22 Cal.3d 626 [150 Cal.Rptr. 461, 586 P.2d 942] [fees may not be awarded as sanction under court's supervisory authority].) Courts of Appeal are split on the question. (Cf. *County of Inyo* v. *City of Los Angeles* (1978) 78 Cal.App.3d 82, 91 [144 Cal.Rptr. 71] [assuming exception exists under *Williams* v. *MacDougall* (1870) 39 Cal. 80, 85-86]; *Young* v. *Redman* (1976) 55 Cal.App.3d 827, 838-839 [128 Cal.Rptr. 86] [California courts without jurisdiction, absent statute, to award fees for bad faith].)

[346 P.2d 748].) Justifying the denial of recovery to the attorney was the fact that he could recover his fee from his client, the trustee.

Yet *Central Railroad & Banking Co.* v. *Pettus* (1885) 113 U.S. 116 [28 L.Ed.915, 5 S.Ct. 387], held that the attorney had an independent right against the fund.[9] The theory was that he, like the client, had conferred a benefit on class members and thus, to avoid unjust enrichment, should be compensated. As the court explained in *Lindy II, supra,* 540 F.2d 102, on which defendants rely: " '[t]he award of fees under the equitable fund doctrine is analogous to an action in quantum meruit: the individual seeking compensation has, by his actions, benefited another and seeks payment for the value of the service performed.' [*Lindy I*] 487 F.2d at 165. Accordingly, 'a benefit to the fund is supposedly required. . . . The standard formula [of benefit] . . . mix[es] together three distinct ideas: that a fund can be benefited by being "created, increased or protected" (or "preserved").' " (*Lindy II, supra,* 540 F.2d 102, 110, citing Dawson, *op. cit. supra,* 87 Harv.L.Rev. 1597, 1626.)

Therefore, just as the trustee was not permitted to surcharge the fund with personal expenses (*Greenough, supra,* 105 U.S. 527, 538 [26 L.Ed. 1157, 1162]), the attorney's fee-related services were not compensable. "Services performed in connection with the fee application are necessary to the attorney's recovery. They benefit *him,* for without them, the attorney cannot . . . recover. But such services do not benefit *the fund* —they do not create, increase, protect or perserve it. . . . There being no benefit to the fund . . . there should be no attorneys' fee award from the fund for those services." (*Lindy II, supra,* 540 F.2d 102, 111; accord, *Grinnell II, supra,* 560 F.2d 1093, 1102, italics in original.)

A second basis for the rule that attorneys could not recover from the fund for fee-related services was the potential for conflict of interest. Since *Pettus, supra,* 113 U.S. 116, it has been accepted that the attorney's claim is independent of and in addition to his client's claim for costs, including attorney fees. (See Dawson, *op. cit. supra,* 87 Harv.L.Rev. 1597, 1640.) To the extent counsel was permitted to surcharge for fees significantly beyond those to which he was entitled from his client, his motives to protect the client's interest might have been diluted. To the extent he succeeded in asserting the claim, both his client and other fund beneficiaries would lose. The prevailing rule is that one cannot be assessed

---

[9]Professor Dawson treats *Pettus* as an aberration: "The lawyer was suddenly thought of as producer of this wealth, though he did nothing more than perform his contract with his own client, and furthermore had been paid by his client in full the sum he had agreed to accept." (Dawson, *Lawyers and Involuntary Clients: Attorney Fees from Funds* (1974) 87 Harv.L.Rev. 1597, 1603-1604.)

the cost of effecting one's own loss. Thus the prohibition of an award for fee-related services in common-fund cases is an expression of the proscription against awarding *any* fees if competing interests are involved (*Lindy II, supra,* 540 F.2d 102, 110)—a rule which, in turn, embodies the governing principle of the American rule.

The conflict-of-interest basis for the rule in the attorney's instance is illustrated by this court's holding in *Gabrielson, supra,* 56 Cal. 2d 224. The client's aim had been to aggregate monies *against* which she might ultimately assert rights. She succeeded in creating a $200 million fund from which her lawyer was denied fees. Affirming that result this court said, "An attorney retained to recover or protect a common fund so that it would be available when and if his client could establish an adverse right thereto might be induced to forsake his client's interest in the hope of securing more substantial fees from the common fund." (*Gabrielson* v. *City of Long Beach, supra,* 56 Cal.2d 224, 229-230.)

Those two considerations were deemed fully applicable in cases arising under the substantial-benefit doctrine (see, e.g., *Mandel II, supra,* 92 Cal.App.3d 747, 760; *County of Inyo* v. *City of Los Angeles, supra,* 78 Cal.App.3d 82, 91), which developed as a variant of the common-fund theory in cases where no money fund had been created but a nonetheless concrete and significant benefit, impecuniary in nature, had been conferred on an ascertainable class. Courts reasoned, again under the principle of preventing unjust enrichment, that those benefited should share the burden of producing the fruits of litigation. Aside from the nature of the benefit, the rule differed little from the common-fund exception except in one respect: the beneficiaries could be the defendants or a class represented by them. The extension of the rule flowed from the fact that substantial-benefit developed from corporate litigation, wherein shareholder derivative actions were deemed to have conferred a benefit on the corporations against which they were directed. (See, e.g., *Mills* v. *Electric Auto-Lite* (1970) 396 U.S. 375, 390 [24 L.Ed.2d 593, 605, 90 S.Ct. 616]; *Fletcher* v. *A. J. Industries* (1968) 266 Cal.App.2d 313, 318-325 [72 Cal.Rptr. 146].)

Even as a remedy against corporate defendants, however, substantial-benefit was sometimes deemed an instrument of public policy.[10] And, absent a theory designed solely to implement that policy, it was invoked increasingly in cases against government entities. (See e.g., *Mandel* v. *Hodges* (1976) 54 Cal.App.3d 596, 622-623 [127 Cal.Rptr. 244, 90

---

[10]"[T]o the extent that the substantial-benefit rule affirmatively encourages stockholders to exercise their right to seek redress for corporate mismanagement, it serves important considerations of public policy." (*Fletcher, supra,* 266 Cal.App.2d 313, 324.)

A.L.R.3d 728] [*Mandel I*]; *Knoff* v. *City etc. of San Francisco* (1969) 1 Cal.App.3d 184, 203-204 [81 Cal.Rptr. 683].) During this period the doctrinal lines became blurred between substantial-benefit theory and what ultimately developed as the private-attorney-general rationale.[11]

The *Mandel* litigation is illustrative. There a state employee successfully challenged—as an establishment of religion—the practice of allowing government employees paid time off on Good Friday. The action saved the state $2 million in 1973 alone; and the trial court awarded plaintiff $25,000 in counsel fees, finding her a member of an ascertainable class of state employees. The court further found that her attorneys had acted " 'not only on her behalf, but *in the general public interest* and on behalf of members of [her] class. . . .' " (See *Mandel I, supra,* 54 Cal.App.3d 596, 622.) The Court of Appeal affirmed the judgment and also remanded for attorney fees on appeal, reasoning that plaintiff had rendered a "substantial benefit" to the citizens and taxpayers of the state. (*Id.,* at p. 624.)

On remand the court awarded an additional $75,000. The state again appealed, and the Court of Appeal reversed as to the amount and held that counsel who had brought the suit could get fees for services on the prior, but not the current, appeal. (*Mandel II, supra,* 92 Cal.App.3d 747, 760.) Relying on common-fund cases cited by defendants herein, the court reasoned that counsel on the second appeal had vindicated solely their own interest and that no benefit flowed to the public. "Respondent's attorneys are . . . representing essentially their own interest at this time, as distinguished from those of the public to whom the benefits of the antecedent litigation stand secured. In consequence, the 'substantial benefit' theory may not now be applied in their favor." (*Ibid.*)[12]

So holding, the Court of Appeal merely applied the rule articulated by this court in *Gabrielson,* the Third Circuit in *Lindy II,* and the Second Circuit in *Grinnell II,* that considerations peculiar to common-fund and common-benefit cases require that counsel not be compensated for fee-related services. Both federal circuits have held squarely, however, that those considerations are absent when the fee is awarded under a statute embodying a private-attorney-general concept. "In statutory fee award

---

[11]We have recognized that, in California and the federal system, awards were made under the rubric "substantial benefit" in cases where the reasoning would have "fit more comfortably" under the private-attorney-general concept. (*Woodland Hills II, supra,* 23 Cal.3d 917, 947-948.) "In the absence of an established, private attorney general rationale, such an expansion of the substantial benefit theory to effectuate important public policies is understandable." (*Ibid.*)

[12]As discussed *infra,* to the degree the phrase "antecedent litigation" suggests that *Mandel I* involved an "action" distinct from *Mandel II,* we disapprove it.

cases, the considerations of *Lindy II* and the equitable fund cases do not apply. Statutorily authorized fees are not paid out of the plaintiffs' recovery, and the attorney in seeking his fee is not acting in any sense adversely to the plaintiffs' interest. Hence the time expended by attorneys in obtaining a reasonable fee is justifiably included in the attorneys' fee application, and in the court's fee award." (*Prandini* v. *National Tea Co.* (3d Cir. 1978) 585 F.2d 47, 53; accord, *Gagne* v. *Maher* (2d Cir. 1979) 594 F.2d 336, 344, affd. *sub nom. Maher* v. *Gagne* (1980) 448 U.S. 122 [65 L.Ed.2d 653, 100 S.Ct. 2570].)

Defendants urge that all three theories should be deemed similar because, under each, lawyers seek fees from an involuntary client where payment would reduce funds otherwise available to plaintiff or to defendant for use in plaintiffs' behalf. We have rejected that view. *Serrano III,* for example, noted that the "enormous service" plaintiffs rendered to the state would nonetheless not support a fee award under the substantial-benefit theory because no concrete benefits were conferred by this court's holding. "The fundamental holding of *Serrano*—i.e., that the existing school finance system, insofar as it operates to deny equality of educational opportunity to the school children of this state, is thereby violative of state equal-protection guarantees—does nothing in and of itself to assure that concrete 'benefits' will accrue to anyone. . . . [C]oncrete 'benefits' can accrue to the state or its citizens in the wake of *Serrano* only insofar as the Legislature, in its implementation of the command of equality which that case represents, chooses to bestow them." (*Serrano III, supra,* 20 Cal.3d at p. 41, fn. omitted.)

Defendants view the private-attorney-general theory as another version of common-fund. Justice Marshall, dissenting in *Alyeska,* similarly suggested that, under private-attorney-general approach, one consideration should be the extent to which "shifting [the litigation] cost to the defendant would effectively place it on a class that benefits from the litigation." (421 U.S. at p. 285 [44 L.Ed.2d at p. 169].) The majority observed that Congress had imposed "no such common-fund conditions upon the award" under fee-shifting statutes embodying the private-at-torney-general theory, and concluded that the condition "disserve[d] that basis for fee shifting by imposing a limiting condition characteristic of other justifications. [¶] That condition ill suits litigation in which the purported benefits accrue to the general public." (421 U.S. 240, 264-265, fn. 39 [44 L.Ed.2d 141, 157].)

As we said in *Serrano III*: "The 'private attorney general' theory must be accepted or rejected on its own merits—i.e., as a theory rewarding the effectuation of significant policy—rather than as a policy-oriented

extension of the 'substantial benefit' theory burdened with the limitations of that rationale." (20 Cal.3d at p. 45, fn.16.)

## B. Private-Attorney-General Theory

Common-fund and substantial-benefit rest squarely on the principle of avoiding unjust enrichment. The private-attorney-general theory rests on the policy of encouraging private actions to vindicate important rights affecting the public interest, without regard to material gain. (*Serrano III, supra,* 20 Cal.3d at p. 44; *Woodland Hills II, supra,* 23 Cal.3d at p. 933.) A central function is "to call public officials to account and to insist that they enforce the law . . . ." (*Alyeska, supra,* 421 U.S. at p. 267 [44 L.Ed.2d at p. 159].)[13] Implicit is the recognition that "without some mechanism authorizing the award of attorney fees, private actions to enforce . . . important public policies will as a practical matter frequently be infeasible." (*Woodland Hills II, supra,* 23 Cal.3d at p. 933.)

Thus the doctrine will often be frustrated, sometimes nullified, if awards are diluted or dissipated by lengthy, uncompensated proceedings to fix or defend a rightful fee claim. The rule in federal courts of appeals when they construe statutes like section 1021.5, embodying the private-attorney-general doctrine,[14] is that, absent facts rendering the award unjust,

---

[13]The function and operation of the doctrine are described in *Newman* v. *Piggie Park Enterprises* (1968) 390 U.S. 400 [19 L.Ed.2d 1263, 88 S.Ct. 964]: "When the Civil Rights Act of 1964 was passed, it was evident that enforcement would prove difficult and that the Nation would have to rely in part upon private litigation as a means of securing broad compliance with the law. A Title II suit is thus private in form only. When a plaintiff brings an action under that Title, he cannot recover damages. If he obtains an injunction, he does so not for himself alone but also as a 'private attorney general,' vindicating a policy that Congress considered of the highest priority. If successful plaintiffs were routinely forced to bear their own attorneys' fees, few aggrieved parties would be in a position to advance the public interest by invoking the injunctive powers of the federal courts. Congress therefore enacted the provision for counsel fees . . . to encourage individuals injured by racial discrimination to seek judicial relief under Title II.

"It follows that one who succeeds in obtaining an injunction under that Title should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." (*Id.,* at pp. 401-402 [19 L.Ed.2d at pp. 1265-1266], fns. omitted.)

[14]Though Congress has enacted numerous statutes of this type (see, e.g., the list in *Alyeska, supra,* 421 U.S. 240, 260, fn. 33 [44 L.Ed.2d 141, 155]), the one most frequently compared with section 1021.5 is 42 United States Code section 1988, amended in the Civil Rights Attorney's Fees Awards Act of 1976 (Fees Act) to provide: "In any action or proceeding to enforce a provision of section 1981, 1982, 1983 [the Civil Rights Act of 1866], 1985, and 1986 of this title . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

The Fees Act was passed after *Alyeska* held federal courts without jurisdiction, absent explicit statutory authorization, to award fees on a private-attorney-general theory. (421 U.S. 240, 269 [44 L.Ed.2d 141, 159-160].) The pertinent Senate Report stated that the purpose was "to remedy anomolous gaps in our civil rights laws" created by *Alyeska,*

parties who qualify for a fee should recover for all hours reasonably spent, including those on fee-related matters.[15]

The rule that Federal fee statutes ordinarily require a full fee award "unless special circumstances would render such an award unjust" first was stated in *Newman* v. *Piggie Park Enterprises, supra,* 390 U.S. 400, which construed the fee provision under title II of the 1964 Civil Rights Act. (P. 402 [19 L.Ed.2d, p. 1266].)[16] The *Newman* formula was invoked again for substantially identical provisions under title VII of that act (*Albemarle Paper Co.* v. *Moody* (1975) 422 U.S. 405, 415 [45 L.Ed.2d 280, 295, 95 S.Ct. 2362]; cf., *Christianburg Garment Co.* v. *EEOC* (1978) 434 U.S. 412, 419 [54 L.Ed.2d 648, 655, 98 S.Ct. 694] [standard applies to prevailing plaintiffs but not prevailing defendants]) and under the Emergency School Aid Act of 1972 (*Northcross* v. *Memphis Board of Education* (1973) 412 U.S. 427, 428 [37 L.Ed.2d 48, 50-51, 93 S.Ct. 2201]). It is the *Newman* standard—sometimes referred to as the "Newman-Northcross rule"—that Congress apparently intended to control the interpretation of its 1976 Fees Act.[17]

which had rendered fee awards unavailable in "the most fundamental civil rights cases." (See Sen. Jud. Com. Rep. No. 94-1011. at pp. 1, 4, reprinted at 1976 U.S. Code Cong. & Admin. News at pp. 5908, 5911.)

Section 1021.5 has also been described as a legislative response to *Alyeska.* (See, e.g., *Woodland Hills II, supra,* 23 Cal.3d 917, 934; *Common Cause* v. *Stirling* (1981) 119 Cal.App.3d 658, 662-663 [174 Cal.Rptr. 200], citing *Review of Selected 1977 California Legislation* (1978) 9 Pacific L.J. 281, 365-367; *County of Inyo* v. *City of Los Angeles, supra,* 78 Cal.App.3d 82, 89, fn. 2.)

[15]See, e.g., *Bonner* v. *City of Pritchard, Ala.* (11th Cir. 1981) 661 F.2d 1206, 1207 [declaring intent to follow precedent of former Fifth Circuit]; *Manhart* v. *City of Los Angeles, Dept. of Water, etc.* (9th Cir. 1981) 652 F.2d 904, 909; *Jorstad* v. *IDS Realty Trust* (8th Cir. 1981) 643 F.2d 1305, 1314-1315; *Copeland* v. *Marshall* (D.C. Cir. 1980) 641 F.2d 880, 896; *David* v. *City of Scranton* (3d Cir. 1980) 633 F.2d 676, 677; *Bond* v. *Stanton* (7th Cir. 1980) 630 F.2d 1231, 1235-1236, cert. den. *sub nom. Blinzinger* v. *Bond* (1981) 454 U.S. 1063 [70 L.Ed.2d 601, 102 S.Ct. 614]; *Bills* v. *Hodges* (4th Cir. 1980) 628 F.2d 844, 847; *Love* v. *Mayor, City of Cheyenne, Wyo.* (10th Cir. 1980) 620 F.2d 235, 237; *Johnson* v. *State of Mississippi* (5th Cir. 1979) 606 F.2d 635, 637-638; *Gagne* v. *Maher, supra,* 594 F.2d 336, 343-344; *Weisenberger* v. *Huecker* (6th Cir. 1979) 593 F.2d 49, 53-54, cert. den. (1979) 444 U.S. 880 [62 L.Ed.2d 110, 100 S.Ct. 170]; *Souza* v. *Southworth* (1st Cir. 1977) 564 F.2d 609, 614.

[16]The statute provides: "In any action commenced pursuant to this subchapter, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, . . ." (42 U.S.C. § 2000a-3(b).)

[17]The pertinent Senate Report (see fn. 14, *ante*) stated: "It is intended that the standards for awarding fees be generally the same as under the fee provisions of the 1964 Civil Rights Act. A party seeking to enforce the rights protected by the statutes covered by [this legislation], if successful, 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.' (*Newman* v. *Piggie Park Enterprises, Inc.,* 390 U.S. 400, 402 (1968)." (1976 U.S. Code Cong. & Admin. News at p. 5912, fn. omitted.)

Framing the private-attorney-general theory in California, both this court and the Legislature relied on federal precedent. (See *Woodland Hills II, supra,* 23 Cal.3d at p. 934.) Yet even were that not the case the unanimity of the federal rule—reflecting as it does time-tested workability—would merit our deference. Federal courts have reasoned that "[i]f an attorney is required to expend time litigating his fee claim, yet may not be compensated for that time, the attorney's effective rate for all the hours expended on the case will be correspondingly decreased. Recognizing this fact, attorneys may become wary about taking Title VII cases, civil right cases, or other cases for which attorneys' fees are statutorily authorized. Such a result would not comport with the purpose behind most statutory fee authorizations, viz., the encouragement of attorneys to represent indigent clients and to act as private attorneys general in vindicating congressional policies." (*Prandini, supra,* 585 F.2d 47, 53.) The contrary rule that defendants urge "would permit a deep pocket losing party to dissipate the incentive provided by an award through recalcitrance and automatic appeals." (*Souza, supra,* 564 F.2d 609, 614; accord, *Bond, supra,* 630 F.2d 1231, 1235-1236; *Stanford Daily* v. *Zurcher* (N.D.Cal. 1974) 64 F.R.D. 680, 683-684, affd. (9th Cir. 1977) 550 F.2d 464, revd. on other grounds (1978) 436 U.S. 547 [56 L.Ed.2d 525, 98 S.Ct. 1970].)[18] It could permit fees to be determined by the litigiousness of losing parties.

We should not distort our rule by restricting it to (1) persons with means sufficient to finance lawsuits without the assistance of court-awarded fees, and (2) indigents who qualify for legal aid. The showing required under section 1021.5 is substantial. (See fn. 1, *ante.*) In cases where entitlement is vigorously contested, as here,[19] the hours demanded could dwarf those

---

[18]In its amicus brief in support of defendants, Los Angeles County argues that fee awards should include compensation for fee-related services only if the court finds that the losing party has in bad faith sought to dissipate the award "through recalcitrance and automatic appeals." (Citing *Keown* v. *Storti* (E.D.Pa. 1978) 456 F.Supp. 232, 242 & fn. 8.)

Our court has not recognized a "bad faith" exception (see fn. 8, *ante*); but even the federal courts have rejected the "subjective" standard as too narrow to effectuate the purpose of the private-attorney-general concept. (*Newman, supra,* 390 U.S. at p. 401 [19 L.Ed.2d at p 1265].) The standard would also place courts in the unseemly position of assessing the motives of officials of a coordinate branch of government.

The better approach is to reflect the litigiousness of the opposition in the hours required by plaintiff to respond. As observed in *Mandel II,* "If [the Attorney General's] tactics . . . increased the demands made on respondent's attorneys' time, the result will appear in the trial court's base-figure compilation." (92 Cal.App.3d 747, 761.)

[19]For example, defendants here have (1) deposed the professional and clerical staff of Public Advocates, (2) propounded extended interrogatories, (3) brought motions for additional discovery, (4) filed a petition for writ review when further discovery was denied, and (5) refused to comply with the award affirmed in *Serrano III.* The petition for hearing states that, following decision in *Mandel* v. *Myers* (1981) 29 Cal.3d 531 [174

spent to establish the claim on the merits. Citizens of ordinary means are unlikely to file, and competent private practioners are unlikely to accept, public interest litigation, however meritorious, without some assurance of compensation that fairly covers the legal services required.[20]

Nonetheless the federal rule does not license prevailing parties to force their opponents to a Hobson's choice of acceding to exorbitant fee demands or incurring further expense by voicing legitimate objections. *Prevailing parties are compensated for hours reasonably spent on fee-related issues.* A fee request that appears unreasonably inflated is a special circumstance permitting the trial court to reduce the award or deny one altogether.[21] "If . . . the Court were required to award a reasonable fee when an outrageously unreasonable one has been asked for, claimants would be encouraged to make unreasonable demands, knowing that the only unfavorable consequence of such misconduct would be reduction of their fee to what they should have asked in the first place. To discourage such greed, a severer reaction is needful. . . ." (*Brown* v. *Stackler* (7th Cir. 1980) 612 F.2d 1057, 1059.)

We conclude that defendant's first argument is without merit. Principles governing an award under the common-fund or substantial-benefit theory do not control when it is made under the private-attorney-general doctrine.

---

Cal.Rptr. 841, 629 P.2d 935] [*Mandel III*] (filed June 18, 1981), the Court of Appeal approved a stipulated order pursuant to which a portion of the judgment affirmed in *Serrano III* was paid from remaining 1979-1980 Budget Act funds. It also states that the bulk of the judgment and interest thereon remains unpaid. Defendants have not disputed these facts.

The *Mandel* litigation provides a parallel example of tenacious government opposition to a fee award. (See *Mandel I, supra,* 54 Cal.App.3d 596; *Mandel II, supra,* 92 Cal.App.3d 747; *Mandel III, supra.*)

[20]Justice Powell recently has lamented that "the cost of litigation in this country—furthered by discovery procedures susceptible to gross abuse—has reached the point where many persons . . . simply cannot afford to litigate even the most meritorious claim or defense." (*Delta Air Lines, Inc.* v. *August* (1981) 450 U.S. 346, 363-364, fn. 1 [67 L.Ed.2d 287, 299-300, 101 S.Ct. 1146] [Powell, J., conc. in the result].)

[21]See, e.g., *Copeland* v. *Marshall, supra,* 641 F.2d 880, 902-903 [not allowable are hours on which plaintiff did not prevail or "hours that simply should not have been spent at all, such as where attorneys' efforts are unorganized or duplicative. This may occur . . . when young associates' labors are inadequately organized by supervising partners" (fns. omitted)]; *Gagne* v. *Maher, supra,* 594 F.2d 336, 345 [excessive time spent]; *Lund* v. *Affleck* (1st Cir. 1978) 587 F.2d 75, 77 [if initial claim is "exorbitant" and time unreasonable, court should "refuse the further compensation"]; *Reynolds* v. *Coomey* (1st Cir. 1978) 567 F.2d 1166, 1167 [duplication of effort]; *Farris* v. *Cox* (N.D.Cal. 1981) 508 F.Supp. 222, 227 [time on fee petition denied for "overreaching"]; *Vocca* v. *Playboy Hotel of Chicago, Inc.* (N.D.Ill. 1981) 519 F.Supp. 900, 901-902 [fee denied in entirety on ground of counsel's dilatoriness and hours claimed for clerical work]; *Jordan* v. *United States Dept. of Justice* (D.D.C. 1981) 89 F.R.D. 537, 540 [fee denied in entirety on ground of unreasonable request and inadequate documentation].

## C. "ACTION" UNDER SECTION 1021.5

Defendants urge that *Serrano III* vindicated solely the right of plaintiffs' attorneys to a fee and, therefore, did not meet the three requirements of section 1021.5. They cite cases holding that benefits conferred did not transcend claimant's personal interest (*Marini* v. *Municipal Court* (1979) 99 Cal.App.3d 829, 836-838 [160 Cal.Rptr. 465]; see also *Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988, 994-995 [165 Cal.Rptr. 514]) or were insignificant when measured against legislative goals (*Bruno* v. *Bell* (1979) 91 Cal.App.3d 776, 778 [154 Cal.Rptr. 435]).

In essence defendants argue that *Serrano III,* wherein plaintiffs' lawyers enforced their right to the fee for winning on the merits in *Serrano II,* is a separate "action" under section 1021.5 that must independently satisfy the law's requirements.[22] ■ An "action," however, is merely a form of judicial remedy sought to protect a right or redress a wrong. (Code Civ. Proc., §§ 20-25;[23] see generally 2 Witkin, Cal. Procedure (2d ed. 1970) Actions, § 2, pp. 880-881.) ■ *Serrano II* and *III* arose, as did *Serrano I,* from filing a single complaint; they bear the same superior court docket number. Civil code section 3523 states that "[f]or every wrong there is a remedy." "'This maxim of jurisprudence bestows upon the person who may be wronged the right to seek redress in an *action,* and the basis thereof is denominated the *cause of action.*'" (2 Witkin, *op. cit. supra,* at pp. 880-881, citing *Painter* v. *Berglund* (1939) 31 Cal.App.2d 63, 70 [87 P.2d 360], italics added.)

A statutory fee motion "does not create a new cause of action . . ." (*Kievlan* v. *Dahlberg Electronics, Inc.* (1978) 78 Cal.App.3d 951, 959

---

[22]Defendants neither imply nor contend that *Serrano II* failed to meet those requirements. As we said in *Serrano III,* "plaintiffs and their attorneys, as a result of the *Serrano* litigation, have rendered an enormous service to the state and all its citizens by insuring that the state educational financing system shall be brought into conformity with the equal protection provisions of our state Constitution so that the degree of educational opportunity available to the school children of this state will no longer be dependent upon the taxable wealth of the district in which each student lives." (20 Cal.3d at p. 42.)

[23]"Judicial remedies are such as are administered by the courts of justice, or by judicial officers empowered for that purpose by the constitution and statutes of this state." (§ 20.)

"These [judicial] remedies are divided into two classes: [¶] 1. Actions; and [¶] 2. Special proceedings." (§ 21.)

"An action is an ordinary proceeding in a court of justice by which one party prosecutes another for the declaration, enforcement, or protection of a right, the redress or prevention of a wrong, or the punishment of a public offense." (§ 22.)

"Every other remedy is a special proceeding." (§ 23.)

"Actions are of two kinds: [¶] 1. Civil; and [¶] 2. Criminal." (§ 24.)

"A civil action arises out of—[¶] 1. An obligation; [¶] 2. An injury." (§ 25.)

[144 Cal.Rptr. 585] [construing § 1021.5]), much less a new "action." It is a collateral matter, ancillary to the main cause. (*Ibid.*); cf. *Associated Convalescent Enterprises* v. *Carl Marks & Co., Inc.* (1973) 33 Cal.App.3d 116, 120 [108 Cal.Rptr. 782] [attorney fees under Civ. Code, § 1717].) It " 'seeks what is due because of the judgment . . . .' " (*Knighton* v. *Watkins* (5th Cir. 1980) 616 F.2d 795, 797, cited with approval in *White* v. *New Hampshire Dept. of Empl. Sec.* (1982) 455 U.S. 445, 452 [71 L.Ed.2d 325, 331, 102 S.Ct. 1162, 1166-1167].)

Defendants urge that *Serrano* ended when, under section 1021.5, the lawsuit "resulted in the enforcement of an important right" and a "significant benefit [had] been conferred"; i.e., when the *Serrano II* judgment was final. Yet it is inherent in section 1021.5, as under other fee statutes, that fee applications, whenever filed, may not be heard until the benefits are secure. (See *Marini, supra,* 99 Cal.App.3d 829, 835 [§ 1021.5 implies jurisdiction to hear motion after judgment final].) As the court in *White, supra,* observed regarding a Fees Act motion (see fn. 14, *ante*), "[r]egardless of when attorney's fees are requested, the court's decision of entitlement to fees will . . . require an inquiry separate from the decision on the merits—an inquiry that cannot even commence until one party has 'prevailed.' " (455 U.S. at p. 451 [71 L.Ed.2d at p. 331, 102 S.Ct. at p. 1166].)

It is defendants' position that no fees are recoverable for defending the fee award on appeal because the appeal did not independently meet the requirements of section 1021.5. ■ Yet it is established that fees, if recoverable at all—pursuant either to statute or parties' agreement—are available for services at trial and on appeal. (See *Wilson* v. *Wilson* (1960) 54 Cal.2d 264, 272 [5 Cal.Rptr. 317, 352 P.2d 725], citing *Dankert* v. *Lamb Finance Co.* (1956) 146 Cal.App.2d 499, 503-504 [304 P.2d 199] ["A contract for a reasonable attorney's fee in enforcing its provisions embraces an allowance for legal services rendered upon appeal as well during the trial"].) This rule governs whether or not the sole issue on appeal has been fee entitlement. (See, e.g., *Painter* v. *Estate of Painter* (1889) 78 Cal. 625 [21 P. 433]; *Clejan* v. *Reisman* (1970) 5 Cal.App.3d 224, 241 [84 Cal.Rptr. 897].)[24] Courts routinely have awarded fees on appeals vindicating only the right to an award for trial services. At least

---

[24]In *Painter* an attorney was appointed by the superior court to resist a claim against an estate. He succeeded in the trial court and was awarded a $250 fee under a statute that provided, "If the claimant recovers no judgment, he must pay all costs, including defendant's reasonable attorney's fees, to be fixed by the court." (Former Code Civ. Proc., § 1510 [now Prob. Code, § 703].) He also defended the judgment on appeal and was awarded an additional $1,000 for those services. This court affirmed. "The estate stood as much in need of an attorney in the appellate as in the lower court." (78 Cal. at p. 627.)

one such award was made under section 1021.5. (*Wilkerson* v. *City of Placentia* (1981) 118 Cal.App.3d 435, 444-445 [173 Cal.Rptr. 294]; see also *Gunn* v. *Employment Development Dept.* (1979) 94 Cal.App.3d 658, 665-666 [156 Cal.Rptr. 584]; *Rich* v. *City of Benicia* (1979) 98 Cal.App.3d 428, 434 [159 Cal.Rptr. 473].)

■■ Similar awards have been made under Welfare and Institutions Code section 10962 (*County of Humboldt* v. *Swoap* (1975) 51 Cal.App.3d 442, 445 [124 Cal.Rptr. 510]; *Horn* v. *Swoap* (1974) 37 Cal.App.3d 375 383-384 [116 Cal.Rptr. 113]; *Trout* v. *Carleson* (1974) 37 Cal.App.3d 337, 344 [112 Cal.Rptr. 282]; *Roberts* v. *Brian* (1973) 30 Cal.App.3d 427, 431 [106 Cal.Rptr. 360]), Education Code section 44944 (*Russell* v. *Thermalito Union School Dist.* (1981) 115 Cal.App.3d 880, 884 [176 Cal.Rptr. 1), and Civil Code section 1717 (*T. E. D. Bearing Co.* v. *Walter E. Heller & Co.* (1974) 38 Cal.App.3d 59, 64-65 [112 Cal.Rptr. 910]).[25] In *Hutto* v. *Finney, supra,* 437 U.S. 678, the Supreme Court affirmed an award under 42 United States Code section 1988 for an appeal wherein the principal issue was the propriety of the fee award against state officials for prolonging, in bad faith, their defense in a lawsuit challenging prison conditions.

The contrary rule, discussed above, would permit the fee to vary with the nature of the opposition. While attributing no bad faith to the Attorney General's office for its conduct of this litigation, we join those judges who have observed that government "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response." (*Copeland, supra,* 641 F.2d 880, 904.)[26] The trial court lamented here that fee litigation should not be "never-ending";[27] yet as to

---

[25]Welfare and Institutions Code section 10962 provides a fee award for the successful petitioner to the superior court from an administrative decision denying welfare benefits: "The applicant or recipient shall be entitled to reasonable attorney's fees and costs, if he obtains a decision in his favor."

Education Code section 44944, subdivision (e), provided for fees on a similar petition by a dismissed employee to the Commission on Professional Competence: "If the Commission . . . determines that the employee should not be dismissed, the governing board shall pay the expenses of the hearing, including . . . reasonable attorney fees incurred by the employee."

Civil Code section 1717 provides that, in actions on a contract specifying that one party shall be awarded attorney fees, fees shall be awarded to the prevailing party "whether he or she is the party specified in the contract or not. . . ."

[26]Accord, *Wolf* v. *Frank* (5th Cir. 1977) 555 F.2d 1213, 1217 ("Obviously, the more stubborn the opposition the more time would be required . . . "); *Perkins* v. *New Orleans Athletic Club* (E.D.La. 1976) 429 F.Supp. 661, 667 ("Those who elect a militant defense . . . [are responsible for] the time and effort they exact from their opponents.").

[27]The rule proposed avoids the additional proceedings that could be required if our rule differed substantially from that followed in federal courts. Given that California has concurrent jurisdiction over civil rights actions brought under section 1983 (*Williams* v.

section 1021.5 its length truly lies in defendants' hands. Fees may be awarded solely to a "successful party," and awards are discretionary.[28]

In sum, defendants give us no reason in law or logic why we should not follow the rule of the overwhelming majority of courts that have considered the question. We hold therefore that, absent circumstances rendering the award unjust, fees recoverable under section 1021.5 ordinarily include compensation for all hours reasonably spent, including those necessary to establish and defend the fee claim.[29]

Thus we affirm the award for services performed in *Serrano III* and remand the portion of the order that denies compensation for services related to the fee motions.[30]

---

*Hovarth* (1976) 16 Cal.3d 834, 837 [129 Cal.Rptr. 453, 548 P.2d 1125]) and that fees are recoverable in those actions under the Fees Act (42 U.S.C. § 1988; see *Main* v. *Thiboutot* (1980) 448 U.S. 1, 10-11 [65 L.Ed.2d 555, 563, 100 S.Ct. 2502]; see also, *Hutto* v. *Finney, supra,* 437 U.S. 678 [§ 1988 award available in state court actions against state officials]; *New York Gaslight Club, Inc.* v. *Carey* (1980) 447 U.S. 54, 61 [64 L.Ed.2d 723, 732-733, 100 S.Ct. 2024] [§1988 award available in administrative proceeding following referral to state agency]), parties who had prevailed on state claims and were entitled to an award under section 1021.5 might seek to qualify for the ampler award available under section 1988 by establishing that their federal claims were substantial enough to support federal jurisdiction. (See, e.g., *Maher* v. *Gagne, supra,* 448 U.S. at pp. 132-133 [65 L.Ed.2d at pp. 662-663]; *Woodland Hills II, supra,* 23 Cal.3d 917, 937-938 and cases cited.) The further showing would place an additional burden on court and attorney time, as well as increase the fee to be sought under the federal statute.

[28]It would seem obvious that fees would not be recoverable for an appeal that reversed the award entirely or reversed as excessive an award appellant claimed was inadequate. We have said, as a further example, that one who succcessfully petitions the superior court from a denial of welfare benefits and who is entitled to attorney fees (Welf. & Inst. Code, § 10962 [see fn. 25, *ante*]) may not recover an additional award for an appeal merely seeking more favorable legal precedent. (*Le Blanc* v. *Swoap* (1976) 16 Cal.3d 741, 743 [129 Cal.Rptr. 304, 548 P.2d 704].)

Defendants have suggested, as a compromise position, that fees be awarded for fee litigation only when the prevailing party is awarded "all or substantially all" (i.e., 75 percent) of the amount originally sought. That seems unnecesarily confining. Indeed it could place the fate of the claim entirely in the discretion of the trial court. Sufficient controls inhere in the current system, which demands that hours be carefully documented. The trial or appellate court may deem either the hours or the rate excessive, and either may find special circumstances for reducing the award or denying one altogether. We also observe though, that defendants' suggestion concedes that fees are properly awarded under section 1021.5 for fee litigation.

[29]We follow the lead of federal courts because we find, on an independent examination of case law, that the federal rule has proved workable for enforcing the dictates of the private-attorney-general doctrine embodied in federal statutes comparable to section 1021.5. Yet it is not our view that federal authority is of more than analogous precedential value in construing section 1021.5. Federal decisions rest in part on evidence of congressional intent (see e.g., fns. 14 and 17, *ante*) for which there is no California parallel. We envision an independent state rule.

[30]Jurisdiction seems implicit under section 1021.5. (See *Marini, supra,* 99 Cal.App.3d at p. 835; *American City Bank* v. *Zetlen* (1969) 272 Cal.App.2d 65, 67 [76 Cal.Rptr. 898].) The Attorney General disputed the point below, however, and the issue has not been briefed on appeal. We therefore invest the trial court with jurisdiction to hear the matter.

## II. *Discovery?*

 Defendants finally urge that the trial judge abused his discretion by refusing to permit interrogatories aimed at discovering the salaries of lawyers employed by Public Advocates and Western Center, as well as the overhead costs of these organizations. They contend here, as in the trial court, that costs are pertinent to setting the reasonable hourly compensation of plaintiffs' attorneys. (See fn. 6, *ante.*)

The argument must be considered in context. Our *Serrano III* decision expressly approved Judge Jefferson's 1975 use of prevailing hourly rates as the basis for the reasonable market value of lawyers' services in the underlying school-finance litigation. (20 Cal.3d at p. 48.) We remanded the current fee motions for determination "in conformity with the views [therein] expressed . . . ." (*Id.,* at p. 50.) Understandably, the trial court overruled defendants' request for discovery of salaries and overhead "as not . . . in conformity with the laws of this state and particularly Serrano III . . . ." We denied writ-review of that ruling (*Unruh* v. *Superior Court,* 2 Civ. 55393, hg. den. Mar. 8, 1979), and the trial court based the current fee award, like that approved in *Serrano III,* on the prevailing hourly rate figures earlier set by Judge Jefferson.[31]

Defendants seize, however, upon our footnote observation in *Serrano III* that the fact of public or foundational support might be considered in fixing an award under the judicially fashioned private-attorney-general theory.[32] From that slim premise, they urge that a different "touchstone" for reasonable market value of legal sevices is appropriate when the lawyers are employees of a public-interest firm or agency.

Defendants reason as follows: The value of a private practitioner's time is reflected in his "normal billing rate." (*Mandel II, supra,* 92 Cal.App.3d at p. 761, citing *Lindy Bros. Bldrs., Inc. of Phila.* v. *Am. R. & S. San. Corp.* (3d Cir. 1973) 487 F.2d 161, 167 [*Lindy I*].) Since an attorney

---

[31]The formula by which "reasonable market value" is reached is variously phrased. (See, e.g. *Rodriquez* v. *Taylor* (3d Cir. 1977) 569 F.2d 1231, 1248, cert. den. (1978) 436 U.S. 913 [56 L.Ed.2d 414, 98 S.Ct. 2254] ["comparable salaries earned by private attorneys with similar experience and expertise in equivalent litigation"]; *Jorstad* v. *IDS Realty Trust, supra,* 643 F.2d 1305, 1313, citing *City of Detroit* v. *Grinnell Corporation* (2d Cir. 1974) 495 F.2d 448, 471 [*Grinnell I*] ["hourly amount to which attorneys of like skill in the area would typically be entitled"].)

[32]See footnote 6, *ante,* for matters considered in *Serrano III.* We there added in footnote 24, which defendants also cite: "While we have indicated the fact of public or foundational support should not have any relevance to the question of eligibility for an award, we believe that it may properly be considered in determining the size of the award." (*Serrano III, supra,* 20 Cal.3d at p. 49.)

employed by a legal services organization does not bill clients (see fn. 4, *ante*), defendants reason that he "sells" his service to the government or a charitably funded organization in exchange for a salary. Thus, they urge, the "normal billing rate" of a private attorney and the "cost" of hiring a public-interest lawyer (that is, his salary plus overhead costs) must be deemed "homologous": "The 'cost' to a private attorney who gives up work for which he would have billed his time at $50 an hour, is $50 an hour. That is the amount . . . it 'cost' him to provide the 'public interest' litigation. Thus . . . there is no real theoretical difference between the 'cost' and 'market value' approaches."

Given that public-interest lawyers generally are paid at lower than prevailing rates, the computation of their fee awards on the same basis as those to private counsel, defendants contend, results in an impermissible windfall to legal services organizations. Alternatively, defendants urge that cost should be among the factors considered in enhancing or diminishing the touchstone figure. In support of those assertions at the trial level defendants relied principally on *Copeland* v. *Marshall* (D.C.Cir. 1978) 594 F.2d 244 (vacated en banc (D.C.Cir. 1980) 641 F.2d 880).[33]

We do not regard a private attorney's billing rate as comparable to the cost of hiring a public-interest lawyer. Billing rates reflect not only costs but also a margin of profit and the financial stakes of varying clients.[34] Moreover, for salaries to be discoverable they should be "relevant"[35] to the standard of "reasonable value."[36] We fail to see how they are. Costs—high or low—can be subjective and if deemed relevant to value might reward inefficiency and greed.

---

[33]The three-judge panel in *Copeland* had suggested that the "cost-plus" approach was usefully applied in all cases. It was an award to private counsel that was reversed and remanded for a cost accounting.

[34]See, for example, *Rodriquez* v. *Taylor, supra,* 569 F.2d at pages 1247-1248: "The absolute levels of billing rates for attorneys in a private firm depend in large measure on the financial stakes clients have in particular matters. While partnership shares and associates' salaries may vary on the basis of relative experience and responsiblity, the structure of a firm's billing rates is generally a function of the type of work performed and the affluence of its clients. Whether the practitioners be top flight antitrust or securities litigators or contingent fee tort lawyers, billing rates reflect their clients' monetary stakes, whether in the form of potential cash awards or liabilities."

[35]"Interrogatories may relate to any matters which can be inquired into under subdivision (b) of Section 2016 of this code. . . ." (Code Civ. Proc., § 2030, subd. (c).) Under that subdivision "the deponent may be examined regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action . . . ."

[36]As the court said in *Lindy I,* the touchstone figure—the careful compilation of the hours spent and the reasonable value of each attorney's time—is the "only reasonably objective basis for valuing an attorney's services." (487 F.2d at p. 167.) "It is only after such a calculation that other, less objective factors, can be introduced into the calculus." (*Grinnell I, supra,* 495 F.2d 448, 471.)

Inquiries as to cost could also be cumbersome. As the District of Columbia Circuit concluded in its en banc opinion: "The 'lodestar', or 'market value', method of fee setting has the virtue of being relatively easy to administer. We do not want 'a [trial] court, in setting an attorney's fee, [to] become enmeshed in a meticulous analysis of every detailed facet of the professional representation. It . . . is not our intention that the inquiry into the inadequacy of the fee assume massive proportions, perhaps dwarfing the case in chief.' *Lindy II*, 540 F.2d at p. 116. We fear that the proposed 'cost-plus' method of calculating fees would indeed become the inquiry of 'massive proportions' that we strive to avoid." (*Copeland, supra,* 641 F.2d at p. 896.)[37]

The method proposed could also place public-interest firms and their clients at a disadvantage in litigation. Awards to legal services organizations would be markedly lower than those for private practitioners. They would inspire "lesser incentive to settle a suit without litigation than would be the case if a high-priced private firm undertook plaintiff's representation." (*Id.,* at p. 899; accord, *Dennis* v. *Chang* (9th Cir. 1980) 611 F.2d 1302, 1307.) In that event the fate of plaintiff's claim would rest in part on the identity of his counsel.

If on occasion to compensate legal services organizations at prevailing rates seems to give them a "windfall," it is one that accrues to the benefit of public-interest litigation. It thus warrants less judicial scrutiny than would a comparable "windfall" to defendants. The view of the First Circuit is: "We do not think . . . that compensating a public interest organization . . . on the same basis as a private practitioner results in . . . a windfall . . . . Indeed, we are concerned that compensation at a lesser rate would result in a windfall to the defendants." (*Palmigiano* v. *Garrahy* (1st Cir. 1980) 616 F.2d 598, 602, cert. den. (1980) 449 U.S. 839 [66 L.Ed.2d 45, 101 S.Ct.115]; accord, *Oldham* v. *Ehrlich* (8th Cir. 1980) 617 F.2d 163, 168-169 ["a defendant sued by a plaintiff retaining legal aid counsel should not be benefited by the fortuity that the plaintiff could not afford private counsel."].)

---

[37]Since firms have distinct financial structures, what formula, if any, could be fashioned? Would financial records be discoverable and, if so, what privacy considerations might arise? Would any increment for "profit" be afforded to a nonprofit organization? If not, would lower awards to legal services groups comport with equal protection guarantees? (See, e.g., *Fairley* v. *Patterson* (5th Cir. 1974) 493 F.2d 598, 607, fn. 14, disapproved on other grounds in *Alyeska Pipeline* v. *Wilderness Society, supra,* 421 U.S. 240, 270, fn. 46 [44 L.Ed.2d 141, 160].)

The necessity under "cost-plus" of answering those and other questions raises the "specter of a monumental inquiry on an issue wholly ancillary to the substance of the lawsuit." (*Copeland, supra,* 641 F.2d at p. 896.) Ironically, the intricacy of the inquiry could prolong fee litigation, burdening the courts, and hence increase the very awards defendants seek to reduce.

The prevailing federal view is that statutorily authorized fees are computed on the basis of the reasonable market value of the services rendered, without regard to the fact that counsel are employed by an organization funded by public or foundational monies.[38] Whether it goes to private or "public" counsel, an award serves to prevent worthy claimants from being silenced or stifled because of a lack of legal resources. (See *Oldham* v. *Erhlich, supra,* 617 F.2d 163, 169.)

Courts that have addressed cost approaches like that urged here have rejected them.[39] Indeed in *Copeland* even the government's brief conceded this point: " '[F]ees to these firms should not be less than would be the case had a for-profit law firm brought the suit. Strong considerations of public policy require that such firms and lawyers receive fee awards equal to those made to firms and attorneys at large.' " (Quoted in *Copeland, supra,* 641 F.2d at p. 900, fn. 36.)

We therefore hold that the trial court did not abuse its discretion in denying discovery of the salaries paid and the overhead costs of the organizations employing plaintiffs' attorneys. Services compensable under section 1021.5 are computed from their reasonable market value. The trial court was entitled to use the prevailing billing rates of comparable private attorneys as the "touchstone" for determination of that value. Cost figures bore no reasonable relevance to calculation of the "touchstone" figure.[40]

---

[38]See, e.g., *Oldham* v. *Ehrlich, supra,* 617 F.2d 163, 168-169; *Palmigiano, supra,* 616 F.2d 598, 601; *Carey* v. *New York Gaslight Club, Inc.* (2d Cir. 1979) 598 F.2d 1253, 1255, footnote 1, affirmed (1980) 447 U.S. 54 [64 L.Ed.2d 723, 100 S.Ct. 2024]; *Dennis* v. *Chang, supra,* 611 F.2d 1302, 1309; *Perez* v. *Rodriguez Bou* (1st Cir. 1978) 575 F.2d 21, 24; *Reynolds* v. *Coomey* (1st Cir. 1978) 567 F.2d 1166, 1167; *Torres* v. *Sachs* (2d Cir. 1976) 538 F.2d 10, 12-14; *Fairley* v. *Patterson, supra,* 493 F.2d 598, 606-607.

[39]*Miller* v. *Apartments and Homes of N.J., Inc.* (3d Cir. 1981) 646 F.2d 101, 113; *Copeland* v. *Marshall, supra,* 641 F.2d 880, 896-900; *Palmigiano, supra,* 616 F.2d 598, 601; *Torres* v. *Sachs, supra,* 538 F.2d 10, 11-12; *Rodriguez* v. *Taylor, supra,* 569 F.2d 1231, 1247-1250; cf. *Nat. Treasury Emp. U.* v. *U. S. Dept. of Treasury* (D.C.Cir. 1981) 656 F.2d 848, 850-855.

*National Treasury* concluded that the cost method was appropriate where the margin of profit contained in the market value approach would "go toward enrichment of the union's coffers and support of its diverse operations." (*Id.,* 656 F.2d at p. 854.) Since the attorneys were salaried employees of the union but were to receive the award directly, the court reasoned that any profit earned would constitute an impermissible sharing of fees with laymen. It distinguished situations in which the award accrues to the benefit of either the attorneys personally or a public interest organization. "The important consideration [in the latter instance] is that . . . the fees are plowed back into the litigative programs that made their recovery possible in the first place." (*Ibid.*)

[40]Defendants' alternative assertion is that cost should be among the factors considered in determining whether and to what extent the touchstone figure is enhanced or diminished. We think the suggested "consideration" would unnecessarily demean attorneys who do public interest work. "It may well be that counsel serve [legal services] organizations . . . for compensation below that obtainable in the market because they believe the

We thus affirm the award of $39,560 for services rendered in *Serrano III* and remand the portion of the order that denies compensation for preparing the fee motions so that it may be reconsidered in light of this opinion.

Plaintiffs-appellants shall recover their costs on appeal.

Bird, C. J., Mosk, J., Broussard, J., Reynoso, J., and Grodin, J.,* concurred.

**RICHARDSON, J.**—I respectfully dissent.

In return for their services rendered in connection with the equal protection challenge to the school financing system, plaintiffs' attorneys were awarded reasonable attorneys' fees. The award was based upon the so-called "private-attorney-general" theory now codified in section 1021.5 of the Code of Civil Procedure. These attorneys now seek an *additional* award of attorneys' fees, payable from taxpayers' funds, for their time and effort spent solely to collect the prior attorneys' fee award. Such an additional award is beyond the scope of section 1021.5, which limits recovery of attorneys' fees to actions resulting "in the enforcement of an important right affecting the public interest," and conferring "a significant benefit" upon the public or a large segment thereof.

In my view, the correct analysis of the issue before us is contained in the thoughtful opinion of Acting Presiding Justice Stephens written for the Court of Appeal, Second Appellate District, in this case, a pertinent portion of which is as follows:

"Code of Civil Procedure section 1021.5, is dispositive to the appellate fee award for *Serrano III* [*Serrano* v. *Priest* (1977) 20 Cal.3d 25 [141 Cal.Rptr. 315, 569 P.2d 1303)]. The statute sets forth the requirements for a 'private attorney general' attorney fee award, and codifies the trial court's traditional equitable discretion. (*Woodland Hills Resident Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917, 938 [154 Cal.Rptr. 503, 593

---

organizations further a public interest. Litigation of this sort should not have to rely on the charity of counsel any more than it should rely on the charity of parties volunteering to serve as private attorneys general. The attorneys who worked on this case should be reimbursed the reasonable value of their services . . . ." (*Wilderness Society* v. *Morton* (D.C. Cir. en banc 1974) 495 F.2d 1026, 1037, revd. on other grounds *sub nom. Alyeska Pipeline Service Co.* v. *Wilderness Society, supra,* 421 U.S. 240.) That the "costs" of a public-interest firm may not be considered does not mean, however, that the *fact* of public or foundational support is not relevant to the size of the final award. (See *Serrano III, supra,* 20 Cal.3d at p. 49, fn. 24.)

*Assigned by Chairperson of the Judicial Council.

P.2d 200]; *Save El Toro Assn.* v. *Days* (1979) 98 Cal.App.3d 544, 554 [159 Cal.Rptr. 577].) The legislative prerequisites clearly demonstrate the trial court's abuse of discretion in making the award involved herein. Litigating the amount of a fee award on appeal in *Serrano III* cannot be construed as 'the enforcement of an important right' which conferred 'a significant benefit' on 'the general public or a large class of persons.' (Code Civ. Proc., § 1021.5.)

"It is apparent that the Legislature intended 'some selectivity, on a qualitative basis,' in awarding attorneys' fees under section 1021.5. (*Woodland Hills Residents Assn., supra,* 23 Cal.3d 917, 935.) The Supreme Court has instructed that 'the trial court, utilizing its traditional equitable discretion (now codified in § 1021.5), must realistically assess the litigation and determine, from a practical perspective, whether or not the action served to vindicate an important right so as to justify an attorney fee award under a private attorney general theory.' (*Id.,* p. 938.)

"Respondents' efforts in obtaining a sizable fee award (*Serrano III*) do not rise to the level of vindicating 'an important right affecting the public interest.' In *Save El Toro Assn.* v. *Days, supra,* 98 Cal.App.3d 544, 555, the court declared: 'Whether the litigation was actually necessary in order to vindicate the rights of the public has a strong bearing on the question whether, in the words of section 1021.5, a "significant benefit" has resulted.' The only right secured on appeal in *Serrano III* was respondents' entitlement to a fee award, and the only benefit conferred by that litigation was personal to Public Advocates and Western Center. A realistic assessment of the 'importance' of an attorneys' fee award, together with the limited class of beneficiaries, clearly indicates that the supplemental appellate fees ordered for *Serrano III* do not comport with the 'fundamental legislative goals' underlying section 1021.5. (*Woodland Hills Residents Assn., supra,* at pp. 936, 939-940.)

"The absence of the 'private attorney general' doctrine in *Serrano III* is explained by the Court of Appeal's analysis in *Mandel* v. *Lackner* (1979) 92 Cal.App.3d 747 [155 Cal.Rptr. 269]. Although the *Mandel* decision addressed the 'substantial benefit' theory, the court's reasoning has a determinative effect on the attorneys' fee award for *Serrano III.*

"The *Mandel* court decided that respondent's attorneys were not entitled to fees for their services on an appeal which only related to their right to fees as the result of a prior appeal. (*Id.,* at p. 760.) In evaluating the appeal for attorneys' fees, the court declared: 'The stake on this one is not the constitutional principle now perpetually established in the public interest, but the amount of the attorneys' fees earned in the process of establishing it.

Respondent's attorneys are therefore representing essentially their own interests at this time, as distinguished from those of the public to whom the benefits of the antecedent litigation stand secured.' (*Ibid.*; cited with approval in *Marini* v. *Municipal Court* [1979] 99 Cal.App.3d 829, 838 [160 Cal.Rptr. 465], [a 'private attorney general' decision].)

"If for no other reason, the trial court's attorney-fee order regarding *Serrano III* must be reversed 'for want of the pivotal element of predominant public interest.' (*Marini, supra,* at p. 838.) From a 'practical perspective,' it is difficult for this court to perceive any significant benefit derived by the public from the $39,560 award. (See, e.g., *Bruno* v. *Bell* (1979) 91 Cal.App.3d 776, 787 [154 Cal.Rptr. 435].)

"Respondents argue that defense of the fee award in *Serrano III* caused them to forego the representation of other 'public interest' claims. Public Advocates and Western Center urge this 'fees for fees' scenario to purportedly permit the litigation of public interest cases on their merits. Respondents also contend that ordering attorneys' fees for securing fees will terminate protracted litigation over awards with recalcitrant defendants possessing greater legal resources. Superficially attractive, these arguments fail to satisfy statutory requirements for a 'private attorney general' award.

"The use of $39,560 to help finance additional public interest litigation is not at issue before this court. While we recognize respondents' strong legal efforts, we do not here adjudicate the value thereof. (*Marini* v. *Municipal Court, supra,* 99 Cal.App.3d 829, 837-838.) The public benefits allegedly forfeited through respondents' involvement in the *Serrano III* appeal are obviously too speculative to satisfy 'the standard of significance' dictated by section 1021.5 and the relevant judicial authorities. (*Id.*, at p. 837.) Any public value derived from the *Serrano III* appeal is 'wholly coincidental to the attainment of [respondents'] personal goals.' (*Ibid.*)

"Respondents seek to highlight their limited ability to bear the expense of extended litigation, and the relative legal resources of the state appellants. 'Disparity of economic resources has played a role in some counsel fee decisions, but only where the basic requisites of the award were otherwise satisfied. [Citation.]' (*County of Inyo* v. *City of Los Angeles* (1978) 78 Cal.App.3d 82, 90 [144 Cal.Rptr. 71].) The economic arguments cannot substitute for failure to qualify for a 'private attorney general' award in the *Serrano III* appeal.

"Public Advocates and Western Center contend that the attorneys' fee award for the constitutional litigation in *Serrano II* [*Serrano* v. *Priest*

(1976) 18 Cal.3d 728 (135 Cal.Rptr. 345, 557 P.2d 929)] should not be diminished by a denial of appellate fees in the *Serrano III* effort to secure that award. Respondents argue that to exclude fees for *Serrano III* would substantially reduce their 'effective recovery of fees for all *Serrano* appellate work,' and violate 'the spirit of the private attorney general doctrine.' The 'diminution' argument fails to recognize the critical distinction between the *Serrano II* and the *Serrano III* litigation, and contravenes an express statutory requirement for a 'private attorney general' award. Respondents' limited financial resources do not satisfy the statutory directives, because Public Advocates and Western Center did not incur a 'disproportionate' financial burden in securing their personal interests. (*Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App. 3d 988, 994 [165 Cal.Rptr. 514]; *Marini* v. *Municipal Court, supra,* 99 Cal.App.3d 829, 836.)

"The trial court award of attorney's fees for the *Serrano III* appeal contravenes the section 1021.5 requirement relating to 'the necessity and financial burden of private enforcment.' 'An award on the "private attorney general" theory is appropriate when the cost of the claimant's legal victory transcends his personal interest, that is when the necessity for pursuing the lawsuit placed a burden on the plaintiff "out of proportion to his individual stake in the matter." [Citation.]' (*County of Inyo* v. *City of Los Angeles, supra,* 78 Cal.App.3d 82, 89; *Woodland Hills Residents Assn., Inc.* v. *City Council, supra,* 23 Cal.3d 917, 941.) The award at issue here does not meet this basic condition.

"The sizable attorneys' fee award affirmed in *Serrano III* and the settlement with the county defendants reimbursed respondents for their 'private enforcement' effort in *Serrano II.* But the only benefits conferred in *Serrano III* were personal to Public Advocates and Western Center, and respondents' individual interests in attorneys' fees transcended the cost of their legal victory.

"In summation, the Supreme Court in *Serrano III* listed three basic factors to be considered in awarding fees on the 'private attorney general' theory. (20 Cal.3d 25, 45.) If a trial court 'determines that the litigation has resulted in the vindication of a strong or societally important public policy, that the necessary costs of securing this result transcend the individual plaintiff's pecuniary interest to an extent requiring subsidization, and that a substantial number of persons stand to benefit from the decision, the court may exercise its equitable powers to award attorney fees on this theory.' (*Ibid.*)

"The three-pronged test was applied by the Supreme Court in *Serrano III* to affirm the 'private attorney general' fee award for the constitutional litigation climaxed in *Serrano II.* (*Id.,* at pp. 46-47.) However, all three factors in the equitable doctrine weigh against the propriety of attorneys' fees for the *Serrano III* appeal. First, the relevant public policy grounded in the state Constitution was vindicated in *Serrano II.* This court cannot accept the 'fees for fees' award at issue here as 'the vindication of a strong or societally important public policy.' Second, respondents' pursuit of substantial attorneys' fees should not be subsidized through an additional 'private attorney general' award. (see, e.g., *Bruno* v. *Bell, supra,* 91 Cal.App.3d 776, 786.) Finally, the *Serrano III* fee litigation will have no widespread public benefit, as only respondents stood to receive an attorneys' fee award. The circumstances of the case at bar also fall short of meeting the Supreme Court indices for a 'private attorney general' award."

I would reverse the trial court's order awarding attorneys' fees for the *Serrano III* appeal.

The petitions of all parties for a rehearing were denied November 29, 1982. Newman, J., and Kaus, J., did not participate therein. Richardson, J., was of the opinion that the petitions should be granted.